385 S.E.2d 253

**STATE of West Virginia**

v.

**Glen Dale WOODALL.**

**No. 18662.**

Supreme Court of Appeals of West Virginia.

July 6, 1989.

---

Jeffrey L. Hall, Asst. Atty. Gen., Charleston, for State of W.Va.

Rudloph L. DiTrapano, Lonnie C. Simmons, Ditrapano & Jackson, Charleston, for Glen Dale Woodall.

NEELY, Justice:

On 22 January 1987, at about 1:15 p.m., a woman was abducted at knife point from the parking lot of the Huntington Mall in Barboursville, West Virginia by a man wearing a ski mask. The masked assailant forced the victim to shut her eyes through-

out the attack. Repeatedly threatening to kill her, the assailant drove the victim in her own car around Cabell County. The victim could not identify the environs through which they drove.

While driving the car, the assailant had the victim raise her arms. He tore and cut her clothing and fondled her breasts. He ordered her to spread her legs. When she refused, he forced them apart, saying, "Spread your legs, bitch, and do what I tell you to and you won't get hurt. I'm only going to keep you a few minutes and then I'll let you go." He ordered her up and jerked her skirt aside. He hacked the victim's underwear with a knife and fingered her genitals. Holding the knife to her genitals, the assailant threatened to cut her up. "You don't think I'll do it, do you, bitch?" The victim pled for mercy. Driving on a few minutes, the attacker then forced the victim to fellate him, again holding a knife to her throat. Angered at her attitude, he jerked her up into her seat. The victim sought solace in prayer. Her attacker accosted her, "What are you doing, bitch? You talk to me. What are you up to?" He again forced fellatio. While that continued he cut the victim's skirt and fingered her rectum, then her vagina. Claiming she didn't enjoy his attacks, he made her sit again with her head in her lap.

Stopping the car, the attacker forced the victim to her knees. He threatened her again, "You better shut up, bitch, because I'll kill you. I've killed someone before and I'll do it to you." He sodomized her and then raped her. He then forced her into the back seat of the car, had her lie on her stomach, and sodomized her. He then raped her again. Biting the victim on the back, the attacker dismounted and had the victim get in the front seat and compose herself. He again threatened, "I'm going to have to kill you because I know you saw me."

The assailant searched the victim's purse, taking all her money ($5.00) and her watch. He again forced fellatio. The victim briefly opened her eyes, noting that the attacker wore brown pants and that he was uncircumcised. Cursing her, the assailant then let her out of the car. He claimed a friend was following who would hurt her if she opened her eyes; he knew who she was, he said, and his friend would kill her if she called the police.

When she finally opened her eyes, the victim was alone on a roadside. She sought help from a woman nearby. It was then 2 p.m. Forty-five minutes had passed since the abduction began.

Another woman was held in the same terror a few weeks later, on 16 February 1987. At 3 p.m. she entered her car in the Huntington Mall parking lot and then got out again to scrape ice from the windscreen. As she reentered the car, a man jumped her, struck her, and forced her into the passenger seat. He told her to shut up and close her eyes. "If you know who I am or if you see me, I'll kill you," he threatened. He rummaged through her pocketbook, accosted her by name, and asked her personal questions. He claimed to be acting for a friend revenging some slight by the victim.

The attacker bound the victim's eyes and hands with tape. He seized the gold wristwatch she wore. The victim was able to see slightly with her right eye, and observed that the assailant drove her car out of the parking lot and onto Interstate 64 East. On the way he pulled open the victim's clothing and fingered her vagina. He forced the victim to fellate him, then he struck her and pushed her back to the passenger side of the car. As the car slowed to a stop at the Milton exit, the victim tried to unlock the door to escape. The attacker struck her to the floor, and yelled that he would kill her if she tried to escape.

The assailant drove into a secluded spot and parked to "wait" for his "buddy" in a van (he said). He took off the victim's clothes, climbed atop her and raped her. After a bit, he forced her to climb on top of him, maneuvering within the car, and raped her again. He turned the victim on her stomach and again raped her. He then flipped her over onto her back and again raped her.

The assailant had the victim put on her clothes, and began driving the car. He told her, "You'll not live to see another day. You won't see anything else." He stopped the car, claiming his "buddy's van" was there. He taped the victim's hands to the gearshift, then took some time wiping the car interior and effects with paper towels he found there. He left her. She counted to sixty several times, then looked up to see that she had been returned to the Huntington Mall. About an hour had passed since she had first been abducted. She drove herself to a hospital.

Glen Dale Woodall stands convicted of nineteen criminal counts arising from these two attacks on women in the Huntington area. Counts one through seven charged first degree sexual assault as to the first victim,[1] count eight charged first degree sexual abuse as to the first victim,[2] count nine charged kidnapping of the first victim,[3] and count ten charged aggravated robbery of the first victim.[4] Counts eleven through fifteen charged first degree sexual assault of the second victim. Counts sixteen and seventeen charged first degree sexual abuse of the second victim, count eighteen charged kidnapping of the second

victim, and count nineteen charged aggravated robbery of the second victim.

At trial, the victims' accounts of the crimes were largely undisputed, and the major issue was the identity of the assailant. The defendant's case consisted largely of alibi testimony, which the jury rejected. The prosecution's case consisted primarily of circumstantial evidence, which, taken together, the jury found convincing.

The evidence against Mr. Woodall included blood analysis of the defendant, compared to semen samples recovered from the victims; body hair and beard hair from the defendant compared to hair recovered from the car where victim one was attacked; an out-of-court voice identification of the defendant by victim two; a partial visual identification by victim two; a distinctive smell about the assailant noted by both victims, found also at the defendant's workplace; victim two's identification of the assailant's hair color, compared to the defendant's; victim one's identification of the pants worn by the assailant as similar to the defendant's; both victims' testimony that the assailant was uncircumcised, as was the defendant; and, victim two's identification of the defendant's boots and jacket as similar to the assailant's.

---

1. *W.Va.Code,* 61–8B–3 [1984] states in pertinent part:

   (a) A person is guilty of sexual assault in the first degree when:
   (1) Such person engages in sexual intercourse or sexual intrusion with another person and, in so doing:
   (i) Inflicts serious bodily injury upon anyone; or
   (ii) Employs a deadly weapon in the commission of the act ...
   *W.Va.Code,* 61–8B–1(7) [1986] states:
   "Sexual intercourse" means any act between persons not married to each other involving penetration, however slight, of the female sex organ by the male sex organ or involving contact between the sex organs of one person and the mouth or anus of another person.

2. *W.Va.Code,* 61–8B–7 [1984] states in pertinent part:

   (a) A person is guilty of sexual abuse in the first degree when:
   (1) Such person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion.

3. *W.Va.Code,* 61–2–14a [1965] states in pertinent part:

   If any person, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this State or within this State, or otherwise kidnap any other person, for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, or for the purpose or with the intent of shielding or protecting himself or others from bodily harm or of evading capture or arrest after he or they have committed a crime, he shall be guilty of a felony ...

4. *W.Va.Code,* 61–2–12 [1961] states in pertinent part:

   If any person commit, or attempt to commit, a robbery in any other mode or by any other means, except as provided for in the succeeding paragraph of this section, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than five nor more than eighteen years.

Mr. Woodall's case-in-chief asserted alibi. He offered several witnesses, generally family and friends, who stated that the defendant was otherwise occupied during the attacks. Mr. Woodall also testified for himself. Mr. Woodall was convicted of all nineteen counts, without mercy on the kidnapping counts. He was sentenced to two life terms without parole and 203 to 335 years, all to be served consecutively.

Before trial, the defendant sought to have the trial court order an experimental new blood test known as DNA print analysis. Because no expert testimony was offered by the defendant to show the validity or reliability of the DNA test, the trial court refused to order the test. After trial, the defense raised this issue again, and a DNA test was finally performed. The test compared DNA samples from the defendant's own blood with DNA samples recovered from semen of the assailant. The test proved inconclusive.

## I.

The major issue in this case is the admissibility of DNA print analysis tests. No state's high court has yet considered the use of DNA forensic tests; however, an intermediate court in Florida has held that these tests are admissible in criminal trials. *Andrews v. State*, 533 So.2d 841 (Fla.App. 1988).

The traditional test for admitting results of novel scientific techniques has been the *Frye* rule. *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Frye* has been the rule in West Virginia. *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980). The *Frye* rule is that evidence from new scientific tests will be admitted only on a showing that the tests are generally accepted by scientists in the field.

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in the twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or dis-covery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. *Frye, supra*, at 1014.

Under *Frye*, a hearing was required to determine scientific acceptance of new tests before the evidence could be admitted. There has been some confusion whether *Frye* has been implicitly superceded by the *Federal Rules of Evidence* and state rules that follow the federal pattern. *See* Gianelli, "The Admissibility of Novel Scientific Evidence: *Frye v. United States*, Half–Century Later," 80 *Colum.L.Rev.* 1197 (1980); *Reager v. Anderson*, 179 W.Va. 691, 371 S.E.2d 619, 628 n. 4 (1988); *State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870, 874 n. 4 (1988).

Under *W.Va.R.Evid.*, Rule 702, expert testimony is admissible when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." This broad standard of admissibility seems to overrule *Frye* as the standard for admitting scientific evidence. Rule 702 is tempered, of course, by the broad limits on irrelevant, prejudicial, confusing, or misleading evidence, *W.Va.R.Evid.*, Rules 401 and 403 [1985].

Rules 702 and 403, taken together, preserve the policies underlying the *Frye* rule. But under *Frye* the burden was upon the proponent of the test to demonstrate its scientific reliability. Under the Rules, *W.Va.R.Evid.*, Rule 702 makes all expert testimony concerning generally recognized tests presumptively admissible and casts the burden of excluding such testimony upon the side seeking exclusion. Thus the side seeking exclusion must show that the test is substantially more prejudicial, misleading, or confusing than it is probative, under Rule 403.

However, when a test is not generally accepted, that circumstance alone meets the threshold requirement of rebutting any presumption of admissibility under Rule 702. Certainly a test clothed with all the trappings of science, but which is not scientifically accepted, is more misleading or

prejudicial than it is probative. Pseudo-science is more dangerous than no science at all. Therefore, at the end of the day we are all brought back essentially to the *Frye* rule with regard to tests that are not generally accepted and the burden of proof that the test is reliable remains on the proponent.

■ The basic reliability of scientific tests is often at issue when such evidence is admitted. Judicial resources can be squandered attacking and supporting scientific tests that are, in fact, generally accepted by scientists in the field. "The tendency of the law must always be to narrow the field of uncertainty." O.W. Holmes, *The Common Law* 127 (1881). For reasons of judicial economy, at some point a trial court may take judicial notice of a test's general reliability. This point occurs when the issue of a test's reliability has been addressed authoritatively by senior appellate courts in a line of cases that determine that the test in question is generally accepted by scientists. This comports with the provisions of *W.Va.R.Evid.*, Rule 201 [1985].

■ As to DNA typing analysis, we find that the reliability of these tests is now generally accepted by geneticists, biochemists, and the like. *See* Thompson and Ford, "DNA Typing: Acceptance and Weight of the New Genetic Identification Tests," 75 *Va.L.Rev.* 45 (1989). Thus, no *Frye* hearing will be required in the future for judicial notice of reliability.

■ This does not, however, mean that DNA tests should always be admitted. Expert testimony may be received to impeach the particular procedures employed in a specific test or the reliability of results obtained. For example, in the case at bar the laboratory wasn't able to isolate a DNA print from the semen. There being nothing to compare to the defendant's DNA print, such evidence would not meet the general relevance test for admission of evidence. Rule 401, *W.Va.R.Evid.* [1985]. In extreme cases, the evidence may properly be found inadmissible under Rules 401, 403 or 702, *W.Va.R.Evid.* [1985]. In other cases, expert testimony may go to the weight

accorded the evidence, with the evidence admitted under Rule 702. *See, e.g., State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870 (1988) and *State v. McCoy*, 179 W.Va. 223, 366 S.E.2d 731 (1988).

## II.

The procedure to be followed in this case was established in *State v. Lawson*, 165 W.Va. 119, 267 S.E.2d 438 (1980). In *Lawson*, the defendant appealed a criminal conviction for statutory rape. The victim was pregnant at the time of trial. A blood test of the infant could show whether the defendant might have been the father. Because the victim claimed that she had not had sexual intercourse before, the test could have exculpated the defendant. The defendant sought a continuance until the birth of the child, so that a paternity test could be conducted. The trial court in *Lawson* refused the continuance and the defendant was convicted. This Court recognized the general validity of the blood test and its usefulness under the circumstances; accordingly we remanded the case to the trial court to conduct the test. "If the blood tests established lack of paternity, then the defendant's motion for a new trial should be granted; however, if they are merely inconclusive, the conviction should stand." 165 W.Va. at 122, 267 S.E.2d at 439.

Because the results of the DNA test that was done in the case before us are central to our holding, we quote from the laboratory report. As to the semen samples, "DNA banding patterns were not obtained . . . due to insufficient amounts of high molecular weight DNA." Defendant's Reply Brief, Exhibit 2. (March 27, 1989 letter from Cellmark Laboratories.) "No conclusion can be reached concerning the origin of the DNA" in the semen samples. *Id.*

This result is not exculpatory. If, for example, a print were obtained but couldn't be definitively linked to the defendant, that might meet the general test for relevant evidence. *W.Va.R.Evid.*, Rules 401 and 702 [1985]. When no print was obtained, any claim that the test tends to exculpate the defendant would only confuse the jury.

*W.Va.R.Evid.*, Rule 403 [1985]. This doesn't go merely to the weight of the evidence, but to its relevancy: It does not tend to make more or less likely any factual issue in the case. *W.Va.R.Evid.*, Rule 401 [1985]. Similarly, the scientific testimony would not be helpful to the jury in determining the facts. *W.Va.R.Evid.*, Rule 702 [1985].

■ In the case before us, the disputed test has been conducted and has proved inconclusive. Therefore, a remand is inappropriate. If there was error in not ordering the test initially, that error is now rendered harmless.

### III.

The defendant challenges several forms of identification offered by the state: statistical evidence from blood-typing and enzyme tests, a voice identification, and a "one-on-one show up." We consider these in turn.

### A. *Statistical Blood Tests*

■ The defendant claims that statistical interpretations of blood tests, presented at trial by the prosecution, were inherently misleading and should have been excluded under *W.Va.R.Evid.*, Rule 403 [1985]. We disagree.

The prosecution's expert compared the blood traits from Mr. Woodall's blood with semen recovered from the victims. He testified that the assailant's blood types were (1) ABO type O; (2) PGM type 2 +; (3) GLO type 2–1; and Lewis or secretor type a–b +. These traits were identical to Mr. Woodall's. The combination would statistically occur in 6 of every 10,000 males in West Virginia. The defendant's expert conducted his own test of blood and semen samples, and found the same blood types. The defendant's expert argued that the occurrence would be 12 in 10,000 males. On cross-examination, he conceded that the figure could be as small as 1 in 20,000 if independent factors such as age, hair color, and the like were considered.

There is no reason to believe that the jury here was unfairly swayed by the grandeur of science, and we find nothing inherently unreliable in statistical evidence based on blood-typing and enzyme tests. First, blood tests themselves are reliable when properly conducted, and these tests are valuable only when their results are placed in the context of statistical probabilities.

■ But statistics drawn from blood tests, or other evidence, can be unfairly prejudicial if the probabilities offered are too low or too high. Hypothetically, if 45 percent of the people in one area have type O blood, as did an assailant, and a defendant does, too, this standing alone proves so little that it borders on irrelevancy.

On the other extreme, very high probabilities may be misleading, because each factor considered multiplies the probabilities for each of the others, and unreliability in any one factor can substantially skew the overall figure given. In the celebrated case *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968), the defendants were an inter-racial couple. A witness described the robbers as a white woman and a black man who left the scene in a yellow car. The prosecution conjectured that 1 in 10 cars is yellow, and that 1 in 1,000 couples inter-racial. Thus the jury was given the figure of 10,000 to 1 odds the defendants were guilty.

In *Collins*, the underlying statistics were wholly conjectural. Moreover, they were all based on one witness's possibly faulty observation or recall. Fearing the jury might have seized on the 1 in 10,000 figure to convict, the California Supreme Court reversed the trial court. *See generally* G. Lilly, *An Introduction to the Law of Evidence*, 496–99 (1987).

Although we recognize the dangers inherent in evidence of probabilities, we do not find them in this case. Blood type and enzyme tests have general scientific acceptance, and the distribution of particular blood traits in the population is ascertainable. *Id.* at 499–504. The party seeking to impeach blood test evidence is free to cross-examine the proponent's experts and offer experts of his own to discredit the conduct of the tests and the underlying

statistical probabilities. That was done in this case.

## B. *Voice Identification*

The prosecution offered a voice identification of the defendant by the second victim, which the trial court admitted. Before he was charged, the defendant was answering polygraph questions inside a room at the police barracks. An officer led the second victim to the door, out of sight of the defendant, and asked if she recognized any voices. Of the two voices she heard, the victim identified one as the assailant's. It was Mr. Woodall's voice.

▉ The factors we consider in admitting any out-of-court identification are outlined in *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976). The touchstone is the reliability of the identification, considering the length of time since the crime, the level of certainty given by the victim, the opportunity during the crime to observe the trait in question, and the degree of attention to the trait during the crime. *Id.* 159 W.Va. at 916, 230 S.E.2d at 481; *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Voice identifications as such are accepted in this jurisdiction. *State v. Hutchinson*, 176 W.Va. 172, 342 S.E.2d 138 (1986). In this case, the *Casdorph* factors suggest the identification's reliability, even if the procedure could be called "suggestive." The victim was quite certain of her identification, based on vivid memory of the assailant's voice, just nine days after the attack. The trial judge properly admitted the out-of-court voice identification.

## C. *Visual Identification*

▉ The second victim testified that after she had made the voice identification, she made a partial visual identification of the defendant. The police sergeant had her observe while several men, Mr. Woodall among them, entered an adjoining room. Victim two was asked to watch for anything familiar about the man. Mr. Woodall entered and sat in the adjoining room. The victim had a clear view from behind him. She told the policeman that Mr. Woodall "fit the man perfect ... from the shoulders down." She also said the boots Mr. Woodall wore resembled the assailant's. Defense counsel made no objection to this testimony when offered and did not ask about it on cross-examination.

After cross-examining the victim, the defense moved to strike the visual identification. Counsel agreed to accept a cautionary instruction. This was given. Whatever objection defendant might have had to the out-of-court identification, if the objection had been voiced, was cured by the agreed-on cautionary instruction. We find no reversible error.

## IV.

The defendant raises several constitutional claims, which we consider in turn.

## A. *Kidnapping and Rape*

▉ Mr. Woodall argues that separate convictions for kidnapping and rape arising out of the same incident violate his right not to be subjected to double jeopardy. As this Court held in *State v. Trail*, 174 W.Va. 656, 328 S.E.2d 671 (1985), abduction and sexual assault are separate and distinct offenses. *W.Va.Code*, 61–8B–3 [1984] and 61–2–14a [1965]. But, as this Court held in Syl. Pt. 2, *State v. Miller*, 175 W.Va. 616, 336 S.E.2d 910 (1985):

> The general rule is that a kidnapping has not been committed when incidental to another crime. In deciding whether the acts that technically constitute kidnapping were incidental to another crime, courts examine the length of time the victim was held or moved, the distance the victim was forced to move, the location and environment of the place the victim was detained, and the exposure of the victim to an increased risk of harm.

The kidnapping charges in this case were not merely incidental to the sexual assault charge. The abductions each lasted over half an hour; each victim was driven some miles from the place of abduction, to a more deserted place; and the victims' physical danger was substantially enhanced. These are harms to be protected against by the kidnapping statute, independent of the

particular harm victims might suffer during the abduction.

## B.  *Multiple Counts*

██  Similarly, the defendant claims that his double jeopardy rights were violated by conviction of the separate counts of sexual assault based on repeated violations of the victims within a relatively short period.  The *Code* defines sexual assault so that each violation of the victim is a separate criminal offense.  *W. Va. Code*, 61–8B–1 [1986]; *State v. Carter*, 168 W.Va. 90, 282 S.E.2d 277 (1981).  But as this Court held in *State v. Davis*, 180 W.Va. 357, 376 S.E.2d 563 (1988), there must be some evidence of the time that elapsed between separate violations charged as distinct counts of sexual assault.  The victims' testimony made a sufficient showing of elapsed time between separate acts, and we find no error in allowing the several counts to go to the jury.

## C.  *Cruel and Unusual Punishment*

██  The defendant claims that the sentences imposed in this case—totalling two life sentences without parole and a maximum of 335 years, to be served consecutively—constitute cruel and unusual punishment under the Eighth Amendment to the *U.S. Constitution*.  We do not agree.  "The appellate court decides only whether the sentence under review is within constitutional limits."  *Solem v. Helm*, 463 U.S. 277, 290 n. 16, 103 S.Ct. 3001, 3009 n. 16, 77 L.Ed.2d 637 (1983).  Although a death sentence for the crime of rape does violate the protection against cruel and unusual punishment, *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), any sentence short of that, including life without parole, for serious crimes against the person, passes constitutional muster.  *See Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *cf. Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).  Thus, the

sentences the defendant received did not constitute cruel or unusual punishment.

## D.  *Unanimous Jury Verdict*

██  Appellant contends his right to a unanimous jury verdict was violated in this case.  *W. Va. Const.*, art. III, § 14 [1872].  Specifically, appellant claims there is no way to tell if the jury was unanimous in finding each element of each count charged, beyond reasonable doubt.  *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Jeffries and Stephan, "Defenses, Presumptions, and Burden of Proof in the Criminal Law," 88 *Yale L.J.* 1325 (1979).

The charges in the indictment went to the jury in general form.  They were not directly linked to the victim's testimony.  Counts I through VII, for example, read identically.[5]  The victims were not asked on the stand, for example, "So when he sodomized you in the back seat, after he had raped you twice, that would be Count 3 of the State's indictment?" (showing her the document).  The jury had to recall the testimony of numerous violations, and itself connect the account of each assault with one of the numerous charges in the indictment.  The defendant seems to argue here that the testimony had to come in the form we described hypothetically above.  We find this claim without merit.

The usual instructions on the prosecution's burden of proof were given exhaustively.  The defendant might have requested a more specific instruction that the state must meet its burden as to each specific element of each distinct count.  Such a request was not made.  For that reason, and not finding plain error, we reject the claim.

## E.  *Jury Misconduct*

██  At trial there was a charge of jury misconduct.  The jury were taking lunch in a public restaurant, and were overheard

---

**5.**  "[T]hat on or about the ____ day of January, 1987, in the County of Cabell, State of West Virginia, GLEN DALE WOODALL committed the offense of '1st DEGREE SEXUAL ASSAULT' by unlawfully and feloniously, subjecting [first victim's name] to sexual intercourse, and in so doing employed a deadly weapon, a knife, in the commission of the act, against the peace and dignity of the State."

discussing the case among themselves. The trial court had instructed them not to do so. The conversation had something to do with laughter during the trial. On hearing the charge, the trial judge interviewed the jurors involved, *in camera*, admonished them, and received their assurance they could and would determine the facts fairly, in accordance with the evidence and the law. This procedure has been held sufficient to meet the constitutional guarantee of a fair trial. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (defendant must show actual prejudice). The judge refused a mistrial. We find no prejudicial error in these events.

A perfect trial is a *rara avis;* accordingly, the law of prejudicial jury misconduct is amorphous. There are several policies to be protected: That the jury receive no evidence beyond the courtroom; that no jury member make up his mind before hearing all the evidence and the law; and that the courts and the jury system not appear unfair. The first is a right personal to the defendant, the second partially so, and the third not at all. *See generally Smith v. Phillips, supra;* Crump, "Jury Misconduct, Jury Interviews, and the Federal Rules of Evidence," 66 *N.C.L.Rev.* 509, 534 (1988); Comment, *"Smith v. Phillips:* Misconduct by or Affecting a Juror in a criminal prosecution," 62 *B.U.L.Rev.* 361 (1982).

When an outsider speaks to a juror, we are most concerned, because inadmissible testimony might be received. Jury discussions among themselves, however, are less troublesome, because they have heard the same evidence in court and remain free to weigh and argue when they later retire to reach a verdict. We find no reversible error.

## V.

■ The defendant claims that he was entitled to a directed verdict on the ground that the circumstantial evidence against him was insufficient as a matter of law to support the charges against him. It is well settled in this State that circumstantial evidence fairly pointing to the defendant will support a conviction. If the evidence "con-

curs in pointing to the accused as the perpetrator of the crime, he may properly be convicted." Syl. Pt. 4, *State v. Phillips,* 176 W.Va. 244, 342 S.E.2d 210 (1986).

## VI.

■ The defendant objected to the admission of evidence of flight. After a search of the defendant's house and work place in Huntington, the police told the defendant he was not yet under arrest. The police also told the defendant that a search warrant would soon issue to take samples of the defendant's hair. After speaking with his lawyer, the defendant left Huntington with his wife. On the road to nearby Ohio, police set up a roadblock to keep the defendant from leaving the state. Mr. Woodall was arrested at the bridge to Ohio.

At a pretrial hearing, the trial judge decided not to admit the evidence. During trial, the judge reconsidered and admitted the evidence. As this Court held in Syl. Pt. 6, *State v. Payne,* 167 W.Va. 252, 280 S.E.2d 72 (1981), "In certain circumstances evidence of the flight of the defendant will be admissible in a criminal trial as evidence of the defendant's guilty conscience or knowledge." The trial court gave a cautionary instruction to the jury about the possible prejudice in such testimony. We cannot say that the trial judge abused his discretion in finding that the evidence was more probative than prejudicial. *W.Va. R.Evid.,* Rule 403 [1985].

## VII.

■ At trial, the court struck the testimony of three surrebuttal witnesses offered by the defense. Because beard hair had been found at the scene of the crime, in the first victim's car, the defense sought to prove that the defendant, usually bearded, was clean-shaven at the time of the crimes. Although fully aware that the state would present rebuttal testimony to show that the defendant did have a beard at the time in question, the defense rested without calling its witnesses. Because this opportunity had been refused by the de-

fense in its case-in-chief, the trial court struck the surrebuttal testimony.

This Court stated in Syl. Pt. 4 of *State v. Massey*, 178 W.Va. 427, 359 S.E.2d 865 (1983), "The admissibility of evidence as rebuttal is within the sound discretion of the trial court, and the exercise of such discretion does not constitute ground for reversal unless it is prejudicial to the defendant." The point that the defendant did not have a beard at the time of the crime was covered in the defendant's case-in-chief, and because the defense had ample opportunity to call additional witnesses, we find no prejudice and no abuse of discretion here.

## VIII.

We do find that conviction under five of the nineteen counts must be reversed. Counts XI and XV of the indictment charged the defendant with first-degree sexual assault of the second victim (on 16 February 1987). A conviction for first-degree sexual assault requires proof of non-consensual sexual intercourse when *serious bodily* injury is inflicted or when the defendant "employs a deadly weapon in the commission of the act." *W.Va.Code*, 61–8B–3 [1984]. The prosecution's theory was that the assailant used a knife in both attacks to threaten the victims. The charge was well supported in the case of the first victim. But for the second victim, there was no evidence that a knife was used to threaten the victim or evidence that the defendant had about his person a *dead-*

*ly* weapon. Although there was some evidence that the victim's bra was cut, this was insufficient evidence from which the jury could have found that the defendant "employed" a deadly weapon. The jury thus should not, as to the second victim, have been instructed on sexual assault in the first degree. A charge of sexual assault in the *second* degree requires no showing of an injury or a weapon, and thus the jury could have convicted the defendant on five counts of that offense. *W.Va. Code*, 61–8B–4 [1984]. The error was prejudicial, and requires reversal of those counts.

## CONCLUSION

The defendant's convictions under Counts I through X and Counts XVI through XIX are affirmed; his convictions under Counts XI through XV are reversed. This case is remanded for a new order sentencing the defendant on the counts that have been affirmed and, in the discretion of the prosecution, for a new trial on Counts XI through XV for second degree sexual assault.[6]

Affirmed in part; Reversed in part; and Remanded.

---

6. Evidentiary insufficiency forecloses retrial for first degree sexual assault. *Burks v. U.S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979).