605 A.2d 1228

**COMMONWEALTH of Pennsylvania**

**v.**

**James Franklin RODGERS, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 10, 1991.

Filed Feb. 26, 1992.

Reargument Denied May 1, 1992.

500

J. Randall Miller, Asst. Public Defender, Hollidaysburg, for appellant.

Darlee E. Sill, Asst. Dist. Atty., Hollidaysburg, for Com., appellee.

Before ROWLEY, President Judge, and KELLY and CERCONE, JJ.

CERCONE, Judge:

This is a direct appeal from the judgment of sentence entered after a jury convicted appellant, James Franklin

Rodgers, of first degree murder,[1] robbery,[2] and aggravated assault.[3] For the reasons appearing below, we affirm.

The events underlying the instant appeal transpired at some time between the hours of 11:30 p.m. and 3:00 a.m. on the night of June 7–8, 1988 when the seventy-two year old victim in the case was assaulted and robbed in his Altoona, Pennsylvania home. A subsequent autopsy disclosed that the perpetrator inflicted at least seventy (70) stab wounds on the victim, Pasquale J. Lascoli. Although many of the wounds were superficial, one thrust of the knife penetrated the victim's heart causing a fatal hemorrhage. Mr. Lascoli's wallet was discovered in a near-by city park several days after the murder.

The subsequent police investigation of the homicide uncovered the facts that appellant not only knew Mr. Lascoli, but that he had proposed a plan to burglarize the victim's residence only a few days before the murder occurred. Further, the fingers of appellant's left hand were observed to be cut and bleeding in the early morning hours of June 3, 1988. Forensic DNA testing of blood stains on various items of apparel disclosed Mr. Lascoli's blood on clothing worn by appellant on the night of the murder, while appellant's blood was detected on the inside pocket of the trousers worn by the victim at the time of his death. This pocket was the location in which Mr. Lascoli had customarily carried his wallet.

Appellant was ultimately arrested and charged with criminal homicide, robbery, aggravated assault, reckless endangerment of another, theft by unlawful taking/disposition, and receiving stolen property. Appellant's pre-trial motion for change of venire was granted, and a jury was impanelled in Lebanon County. The trial was held at the Blair County Courthouse in May of 1990, with the Honorable Ellis W. Van Horn, Jr. of Bedford County specially presiding.

1. 18 Pa.C.S.A. § 2502(a).
2. *Id.* § 3701(a)(1)(i).
3. *Id.* § 2702(a).

The lower court heard oral argument on appellant's timely filed motion for new trial and/or arrest of judgment, as well as on his supplemental post-verdict motion. All post-verdict motions were denied on March 8, 1991 and sentencing was scheduled for April 3, 1991. On the latter date, the lower court sentenced appellant to serve a term of life imprisonment for the murder of Mr. Lascoli. The lower court also sentenced appellant to pay the costs of prosecution and to serve an aggregate concurrent term of incarceration of between five (5) and ten (10) years on the remaining counts. After sentencing, both of appellant's trial counsel of record petitioned for leave to withdraw. Although the lower court granted the petition of Donald E. Speice, Esq., a member of the Public Defender's Office of Blair County, the petition filed by J. Randall Miller, Esq. was denied. Mr. Miller has continued to represent appellant for purposes of this appeal.

■ Appellant's timely filed appeal presents sixteen issues and sub-claims for our review. They are as follows:

1. Frankie Rodgers was denied his right to a speedy trial.

 a. The delay in the commencement of Frankie Rodgers' trial was inordinate.

 b. The delay in the commencement of Frankie Rodgers' trial was inexcusable.

 c. Frankie Rodgers persistently asserted his right to a speedy trial.

 d. Frankie Rodgers was injured by the violation of his right to a speedy trial.

2. The conduct of the prosecutor and certain rulings of the trial court unlawfully hindered defense counsel in his investigation and preparation of this case.

3. The court erred in allowing the prosecutor to present the results of the RFLP analyses performed by the Lifecodes Corporation to the jury.

4. The court unlawfully prevented Frankie Rodgers from presenting evidence to negate or reduce his culpability for the murder of Patrick Lascoli.

a. The court unlawfully prevented Frankie Rodgers from calling Constable Roy Spiers and Ella Jo Flemming to testify about certain out-of-court declarations, inconsistent with his sworn testimony at trial, that had been made by the witness Shawn Thomas.

b. The court unlawfully prevented Frankie Rodgers from calling Kimberly Hileman, Shawn Thomas and Linda Tabor to testify about certain out-of-court declarations, against their penal interests, that had been made by the prosecution witness Melissa O'Schea and the defense witness Michael Anthony.

c. The court erred in denying the defense the short recess of trial it needed to secure the presence and testimony of Dr. James R. Merikangas, M.D., F.A.C.P., and in other rulings that prevented it from presenting scientific evidence to the jury.

5. The court unlawfully thwarted defense attempts to discredit the testimony of prosecution witnesses and establish its own version of the facts through cross-examination and other means of impeachment.

a. The trial court unlawfully prevented Frankie Rodgers from discrediting the prosecution witness David Houtz through cross-examination and the presentation of other evidence tending to show that he had been blackmailed by the prosecution witness Thomas Bowling.

b. The court unlawfully prevented Frankie Rodgers from discrediting Melissa O'Schea, Maria Pierce, Thomas Bowling and other prosecution witnesses through cross-examination and other means of impeachment.

c. The court unlawfully thwarted defense attempts to discredit the testimony of several police officers and of the prosecution's two molecular biologists through cross-examination and other means of impeachment.

6. The court erred in admitting, refusing to strike and re-admitting testimony of Detective Cooper that related certain uncounselled statements made by Frankie Rodgers while he was in police custody.

7. The court erred in permitting improper testimony on rebuttal and in admitting inflammatory photographs taken at the scene of the crime and the autopsy of the victim.

8. The court erred in denying, in whole or in part, the points for charge requested by the defense, particularly the first, fifth, ninth and twenty-third points.

9. The evidence admitted at trial is insufficient as a matter of law to prove that Frankie Rodgers is guilty of murder in the first degree and robbery.

Additionally, appellant has filed a reply brief which advances no new points in response to those raised by the Commonwealth, but merely supplements arguments already raised pertaining to the above sixteen claims.[4] Appellant has also seen fit to provide this court with a supplementary document with the novel title "Errata to Briefs for Appellant." [5]

Before considering the claims of error raised by appellant, we will address the following complaint lodged by appellee: "the Commonwealth objects to the style, format and content of the brief filed on behalf of Appellant, as the Commonwealth believes that the format of the brief is not in compliance with the spirit of the Rules of Appellate

---

**4.** This contravenes Rule 2113(a) which provides that the appellant may file a brief in reply to matters raised by appellee's brief only if they have not previously been raised in appellant's brief.

**5.** As the title implies, this filing comprises an elaborate errata sheet for appellant's brief, reply brief, and his "supplementary brief" (seemingly a substitute for the reproduced record as defined by Pa.R.A.P., Rule 2172, Pa.C.S.A). No authority exists for filing an errata brief. Further, the document fails to comport with the margin and print size requirements of Rule 124(a) and (a)(1). We decline to consider this nonconforming document and exercise our discretion to suppress it pursuant to Pa.R.A.P., Rule 2101, Pa.C.S.A. *See* Pa.R.A.P., Rule 124, Pa.C.S.A. (form of papers). Under Rule 2101, adherence to the procedural rules is mandatory. It is not an option to be followed or ignored on the whim of counsel.

Procedure...." Appellee's brief at 4. We agree with the Commonwealth that the documents filed by appellant do not comport with either the spirit or the letter of the pertinent appellate rules.

Appellant's brief fails to conform with Rule 2111(a) (brief of the appellant) in that the constituent elements of the brief required under subsections (1) through (8) have not been set out in the correct (and most logical) sequence. Additionally, appellant's "statement of questions involved" violates Rule 2116(a) which provides that the questions raised in the brief are to be stated "in the briefest and most general terms, without names, dates, amounts or particulars of any kind." These are at most minor, and somewhat technical, breaches of the procedural rules. However, appellate counsel has also transgressed the rules so as to actively hamper our ability to provide an expeditious review of appellant's case.

■ It is patent that the "Statement of the Case" is to comprise a "closely condensed chronological statement, in narrative form, of all the facts which are necessary to be known in order to determine the points in controversy, with an appropriate reference in each instance to the place in the record where the evidence substantiating the fact relied on may be found." Pa.R.A.P., Rule 2117(a)(4), 42 Pa.C.S.A. Further, the statement of the case "shall not contain any argument. It is the responsibility of appellant to present in the statement of the case a balanced presentation of the history of the proceedings and the respective contentions of the parties." *Id.*, Rule 2117(b). By way of contrast to these clear directives, appellant's statement of the case is replete with irrelevant details, is devoid of substantiating references to the certified record, contains four unexplained charts, and is a blatantly partisan piece of writing.

■ However, the most egregious problem posed for this court by appellant's briefs and accompanying documentation concerns the miniscule size of the type employed and the utter lack of appropriate margins. Documents filed

508

with the appellate courts are deemed to be in substantial compliance with Rule 124, Form of Papers, only if the lettering is "clearly legible" and the lettering is "not smaller than typewriting pica[6] with line spacing (except for quotations) not closer than typewriting double spacing." Rule 124(a)(3). Unfortunately, counsel has not complied with Rule 124 but has instead utilized an oppressively minute type size for appellant's briefs. The difficulties thereby created have been further exacerbated by the fact that counsel has provided no page margins. *See* Rule 124(a)(1) (margin requirements applicable to appellate briefs). The result is a set of densely packed documents which clearly exceed the "content quotient" reasonably contemplated under the page limits set forth in Rule 2135.[7] We strongly condemn this practice.

■ Despite two exceptions discussed *infra*, we are nonetheless convinced that counsel has provided an adequate, if prolix, explanation of the substantive issues raised on appeal. In the interests of both justice and judicial economy we decline to punish appellant Rodgers for the defects in the brief prepared by counsel. Because we have concluded that meaningful review is possible in the instant case, we will not quash the appeal but shall consider the merits of

---

6. The common definition of "pica" size lettering is print measuring 1/6 inch in height carrying ten (10) characters per inch. *See, e.g.,* Webster's New Twentieth Century Dictionary (Unabridged) 1355 (2d Ed.1967).

7. A page in a brief prepared in compliance with the print size and margin requirements of Rule 124, *supra,* should normally consist of up to twenty-seven lines of print bearing sixty-five characters per line for a total of one thousand seven hundred fifty-five characters per page. Although the print size in the documents filed by appellant varies considerably, the most commonly employed size is ⅛ inch in height and measures eighteen characters per inch. Appellant's brief typically carries approximately one hundred twenty characters per line and varies between thirty-six and fifty-nine lines per page. A simple comparative calculation discloses that counsel for appellant has crammed between four thousand three hundred twenty and seven thousand eighty characters onto each page by use of this format. Our calculations reveal that counsel's brief is between *two and one-half* and *four* times longer than the appellate rules permit in a properly formatted brief and constitutes the functional equivalent of a one hundred twenty-five to two hundred page document.

the claims presented. *See, e.g., Commonwealth v. Melvin,* 378 Pa.Super. 59, 548 A.2d 275, *allocatur denied,* 522 Pa. 588, 561 A.2d 741 (1989). When the circumstances warrant it, we will not hesitate either to quash an appeal or to remand for preparation of a new brief.

■ We shall initially address appellant's allegation that the trial court improperly permitted the prosecutor to present the results of DNA/RFLP analyses performed by Lifecodes Corporation of Valhalla, New York on bloodstains found on both the victim's clothing and that worn by appellant at the time of the homicide. The acronym DNA/RFLP signifies "deoxyribonucleic acid restriction fragment length polymorphism." *People v. Wesley,* 140 Misc.2d 306, 307 n. 2, 533 N.Y.S.2d 643, 643 n. 2 (N.Y.Co.Ct.1988). Although DNA/RFLP testing is colloquially called "DNA fingerprinting," we shall eschew that term in favor of the more scientifically correct denotation. The theory and methodology behind DNA/RFLP testing derives from the fields of molecular biology, genetics, and a specialized branch of genetics known as population genetics. *Id.* at 309, 533 N.Y.S.2d at 645. The scientific basis for DNA/RFLP testing lies in the fact that each individual has an entirely unique "genetic signature" because the DNA configuration is different in every individual except for identical twins. *Id.* at 307, 533 N.Y.S.2d at 644. The challenged evidence is the product of a complex, six-step laboratory analysis: (1) extraction, (2) fragmentation, (3) gel electrophoresis, (4) Southern blotting, (5) hybridization, (6) and autoradiographing. *State v. Schwartz,* 447 N.W.2d 422, 425 (Minn.1989). The issue here is whether this testing procedure is admissible to show evidence that the victim's blood stained the clothing appellant wore at the time of the murder and that appellant's blood was found on the victim's trousers.

■ Our law is well established that the trial court enjoys broad discretion in admitting or excluding evidence. *Commonwealth v. Day,* 399 Pa.Super. 399, 404, 582 A.2d 655, 657 (1990), *allocatur denied,* 528 Pa. 607, 596 A.2d 154

(1991). However, this discretion is tempered with regard to the admission of scientific evidence, that which "draws its convincing force from some principle of science, mathematics and the like." *Commonwealth v. Miller*, 367 Pa.Super. 359, 363, 532 A.2d 1186, 1188 (1987), *quoting State v. Brown*, 297 Or. 404, 407, 687 P.2d 751, 754 (1984). Before scientifically adduced evidence may be considered admissible, it must first be shown that it meets the standard established in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C.1923). *Commonwealth v. Topa*, 471 Pa. 223, 230, 369 A.2d 1277, 1281 (1977). *Frye* acknowledges that the point at which a scientific principle or discovery "crosses that line between the experimental and demonstrable stages is difficult to define." *Frye v. United States*, 54 App.D.C. at 47, 293 F. at 1014. In essence, *Frye* assures that those most qualified to assess the general validity of a scientific method will have the determinative voice by requiring that the principle or discovery forming the basis for evidence presented at trial must have gained general acceptance in the particular field to which it belongs. *Commonwealth v. Topa*, 471 Pa. at 232, 369 A.2d at 1282, *quoting United States v. Addison*, 498 F.2d 741, 744 (D.C.Cir.1974). *Accord Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981).

The crux of appellant's two-part argument is that the forensic application of DNA/RFLP analysis is scientifically unreliable in general, and that the methodology employed in this case by Lifecodes Corporation was flawed. In order to determine the validity of appellant's contention that DNA/RFLP testing is scientifically unreliable, the trial court conducted four days of extended pre-trial hearings at which two experts testified on behalf of the Commonwealth: Martin Louis Tracey, Jr., Ph.D., and Kevin C. McElfresh, Ph.D. In what can only be termed a vigorous and hyper-zealous manner, defense counsel repeatedly cross-examined the witnesses regarding both the theoretical and procedural validity of the tests in question. *See* N.T. 4/2/90 at 11–15, 85–183; 4/3/90 at 2–168; 4/4/90 at 2–43, 74–110, 115; and

4/5/90 at 25–125. As a result of these hearings, the trial court reached the following conclusions:

(1) it is generally accepted in the academic community as a sound scientific principle that individuals have unique DNA patterns; (2) techniques and experiments which currently exist and are widely employed in the scientific community are generally regarded as capable of producing reliable results in DNA identification; and (3) Lifecodes Corporation, Valhalla, N.Y., the laboratory at which the tests were conducted, utilized accepted scientific techniques in analyzing the forensic samples in this case.

Trial court opinion filed May 10, 1991 at 6. Mindful of the applicable standard, we have scrupulously examined the record before us. We conclude that the trial judge correctly ruled the expert testimony admissible to show evidence regarding bloodstains on both the victim's and appellant's clothing.

First, the extended interrogation of the Commonwealth's witnesses plainly established that DNA/RFLP analysis has gained general acceptance in the national scientific community. Second, the certified record includes extensive documentation for this fact in the form of reproductions of numerous published scientific studies. *See Commonwealth v. Middleton*, 379 Pa.Super. 502, 512, 550 A.2d 561, 566 (1988) (where expert witness' opinion is not merely based upon personal views, or those of a small segment of the scientific community, testimony is not deficient merely because numerous experts were not called to testify). Further, appellate courts throughout the country have found DNA testing, and the surrounding scientific techniques used to obtain DNA identification results, to be admissible.[8]

**8.** For useful technical discussions of the forensic validity of DNA testing, see also, *Cobey v. State, supra* (concise explanation of the six-phase DNA/RFLP testing); *People v. Wesley, supra* (scientific bases of DNA/RFLP testing); *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.1989) (extensive discussion of scientific theory behind DNA identification tests); *People v. Castro,* 143 Misc.2d 276, 540 N.Y.S.2d 143 (N.Y.Sup.1989) (same). For a Pennsylvania case discussing the scientific validity of electrophoresis testing of genetic markers

*See, e.g.,* Florida: *Andrews v. State,* 533 So.2d 841 (Fla. Dist.Ct.App. 5th Dist.1988), *review denied,* 542 So.2d 1332 (Fla.1989); *Martinez v. State,* 549 So.2d 694 (Fla.Dist.Ct. App. 5th Dist.1989); Maryland: *Cobey v. State,* 80 Md.App. 31, 559 A.2d 391 (1989), *cert. denied,* 317 Md. 542, 565 A.2d 670 (1989); Minnesota: *State v. Schwartz,* 447 N.W.2d 422 (Minn.1989);[9] Virginia: *Spencer v. Commonwealth,* 238 Va. 563, 385 S.E.2d 850 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1171, 107 L.Ed.2d 1073 (1990); *Spencer v. Commonwealth,* 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990); West Virginia: *State v. Woodall,* 385 S.E.2d 253 (W.Va. 1989). *But see Commonwealth v. Curnin,* 409 Mass. 218, 565 N.E.2d 440 (1991) (declining to accept the scientific validity of forensic DNA testing on the basis of questionable test results compiled by Cellmark Diagnostics Corporation from a limited data base). In light of the extensive record developed in the lower court and certified to this court, we conclude that evidence adduced by DNA/RFLP analysis is scientifically valid and satisfies the *Frye* standard made applicable in Pennsylvania by *Commonwealth v. Topa, supra.*

█ The second aspect of appellant's argument contends that the specific testing performed in the instant case by Lifecodes Corporation was invalid. In dealing with such challenges to the admissibility of scientifically adduced test results, courts have followed two different approaches: (1) applying the *Frye* standard as a three-prong test, or (2) treating the issue as a challenge to the weight of the particular evidence to be admitted. *People v. Castro,* 144 Misc.2d 956, 959–60, 545 N.Y.S.2d 985, 987 (N.Y.Sup.1989). Under the prior method, the first prong considers whether

using dried bloodstains, see *Commonwealth v. Middleton,* 379 Pa.Super. 502, 550 A.2d 561 (1988).

**9.** In *Schwartz,* the Minnesota Supreme Court accepted the scientific validity of DNA typing, but declared the particular test results at issue in the case to be inadmissible because the laboratory had neither applied appropriate standards and controls nor made its testing data and results available.

there is an underlying theory which is generally accepted in the scientific community and which supports a reliable conclusion; the second prong determines whether techniques or experiments currently exist capable of producing generally acceptable and reliable results; and the third prong addresses whether the testing laboratory in question correctly performed the scientific techniques and procedures when analyzing specific forensic samples. *Id.* The alternative approach applies the first two prongs of the *Frye* test as enunciated in *Castro*, but treats the third prong as a credibility determination for the factfinder.

In the instant case, the trial court elected to follow the latter rubric. After the exhaustive pre-trial hearing, Judge Van Horn first applied the *Frye* standard to the scientific theory and procedure underlying the proffered evidence as a two-pronged test. He then made a threshold evaluation as to the relevance, probity, and technical validity of the specific results derived from the forensic testing performed by Lifecodes Corporation. Only then was this evidence ruled admissible at trial.[10] We endorse this approach for DNA multisystem identification tests because it provides

10. As the lower court explained in the decision filed after the pre-trial hearing:

[I]t is our opinion that the Commonwealth has demonstrated that Lifecodes utilized accepted scientific techniques in analyzing the forensic samples in this case. The autoradiographs produced memorialize the experiments Lifecodes conducted, and the [appellant] has been granted sufficient discovery to afford an opportunity for independent review. The issues raised by the defense [regarding] the interpretation of the autoradiographs (e.g., use of degraded samples, adjustment for band shifting, declaration of matches, and statistical conclusions) go to the weight of the challenged evidence. . . .

Trial court opinion filed April 20, 1990 at 3. Judge Van Horn's careful analysis and explanation of the rationale he employed has eliminated any question that the admission of the DNA/RFLP evidence in the instant case resulted from a casual or truncated review by the lower court. *Compare Commonwealth v. Curnin, supra* (wherein the Massachusetts Supreme Court held that it was error to permit forensic DNA test results to go to the jury without a threshold determination regarding the probity of the evidence in light of alleged deficiencies in the analytic methodology employed by Cellmark Diagnostics Corporation).

the highest degree of protection for the defendant by restricting the jury's access to non-probative evidence with the potential for a highly prejudicial impact.[11] The procedure adopted by the lower court in the instant case promotes a scrupulous and explicit analysis of the probity of this complex evidence, both as a matter of law and as a question of fact. *Accord Commonwealth v. Curnin, supra; State v. Woodall, supra; People v. Castro, supra.*

■ Generally, evidentiary rulings are subject to the discretion of the trial court and will not be reversed absent a clear showing of abuse. *Commonwealth v. Holloway,* 524 Pa. 342, 354, 572 A.2d 687, 693 (1990). The fact that DNA/RFLP evidence is highly complex and possesses a potentially large impact on the jury does not change the applicable scope of review. It has always been, and continues to be, a function of the trial court to balance the prejudicial effect of evidence against its probative value. *See, e.g., Commonwealth v. Dollman,* 518 Pa. 86, 91, 541 A.2d 319, 321 (1990). It is not for an appellate court to usurp this function, and the trial court's ruling as to admissibility will not be disturbed absent abuse of discretion. *Id.* Our careful review of the pre-trial hearing transcripts discloses no indication that Judge Van Horn committed any abuse of discretion in making the threshold determination that Lifecodes Corporation's DNA/RFLP test results should be presented to the jury as proper evidence regarding the identity of the bloodstains on both the victim's and appellant's clothing.

■ Insofar as appellant's contentions may be interpreted as a challenge to the weight accorded by the fact finder to Lifecodes' results, we note that the Superior Court has a duty to review weight of the evidence claims for any

**11.** *See, e.g., State v. Joon Kyu Kim,* 398 N.W.2d 544 (Minn.1987) (discussing the danger that a jury will improperly interpret the statistical analysis underlying DNA evidence as a measure of the probability of a defendant's guilt or innocence). *Contra State v. Schwartz, supra,* (Kelley, J. concurring specially) (questioning the continued viability of the evidentiary restrictions imposed by *Joon Kyu Kim*); *Martinez v. State, supra.*

indication that the trial court has committed an abuse of discretion. *Commonwealth v. Murray*, 408 Pa.Super. 435, ——, 597 A.2d 111, 114 (1991) (*en banc*). However, the determinations of the fact finder will not be disturbed on appeal if they are supported by the record. *Commonwealth v. Zapata*, 447 Pa. 322, 290 A.2d 114 (1972). A claim that the evidence presented at trial was unable to support the verdict requires the grant of a new trial only when the verdict is so contrary to the evidence as to shock one's sense of justice. *Id.; Commonwealth v. Hunter*, 381 Pa.Super. 606, 618, 554 A.2d 550, 555 (1989); *Commonwealth v. Saksek*, 361 Pa.Super. 173, 522 A.2d 70 (1987). Our review of the record substantiates the trial court's ruling that appellant was provided ample opportunity at trial to challenge the credibility of Lifecodes' data and test results via both the direct testimony of an expert witness called by the defense and through cross-examination of the Commonwealth's witnesses.[12]

We have scrutinized with great particularity the evidence provided by Ross Cameron Hardison, Ph.D., a biochemist expert in the field of molecular cell biology and DNA analysis, who testified for the defense. Dr. Hardison stated that he was "very impressed with the vast bulk of the data [produced at Lifecodes]." N.T. 5/15/90 at 35. This defense witness even went so far as to characterize a contested piece of evidence as "beautiful," signifying that it was an excellent sample displaying obvious data bands derived from "a good bit of DNA." *Id.* at 45. In addition to Dr.

---

**12.** The extensive testimony on these questions occupied five days of the trial and comprises approximately six hundred pages of transcript. *See* N.T. 5/5/90 at 2–78 (testimony of Robert Vislosky, forensic chemist at the State Police Crime Laboratories, Greensburg, Pa.); N.T. 5/7/90 at 3–112 and 5/8/90 at 3–12 (testimony of Lisa Bennett, technician who performed sample testing for Lifecodes Corporation); N.T. 5/8/90 at 13–211 (testimony of Kevin C. McElfresh, Ph.D., Director of the Forensics Laboratory at Lifecodes Corporation); N.T. 5/9/90 at 2–103, and 114–177 (testimony of Martin L. Tracey, Jr., Ph.D., a molecular biologist expert in RFLP analysis and a member of the faculty of the University of Miami); and N.T. 5/15/90 at 2–52 (testimony of Ross Cameron Hardison, Ph.D., biochemist and member of the faculty at Penn State University).

516

Hardison's testimony, we have carefully reviewed all of the expert testimony presented at trial. *See* note 12, *supra.* *See also* Pa.R.A.P., Rule 2152(c), Pa.C.S.A. (the fact that the reproduced record does not include parts of the certified record shall not prevent the appellate courts from relying on such parts). As a result, we are convinced that the jury had an adequate basis upon which to make its credibility determination regarding the data produced by Lifecodes Corporation relating to the source of the bloodstains on both the appellant's and the victim's clothing. Since the trial court correctly ruled that the expert testimony was admissible, and because appellant was afforded an adequate opportunity to discredit the specific test results admitted, we discern no basis upon which to grant relief.

 Appellant also contends that it was error for the trial court to admit, refuse to strike, and to re-admit the testimony of Police Detective Cooper regarding certain un-counselled statements made by appellant while he was in police custody. The record shows that the trial judge made his determination in this regard based upon the findings of fact and conclusions of law filed by the Honorable Thomas G. Peoples, Jr., P.J., following a suppression hearing on the admissibility of Detective Cooper's testimony. This was a proper approach for the trial judge to take regarding the admissibility of relevant evidence because judges of coordinate jurisdiction sitting in the same court and in the same case should not overrule each other's decisions. *See Okkerse v. Howe,* 521 Pa. 509, 518, 556 A.2d 827, 831 (1989); *Golden v. Dion & Rosenau,* 410 Pa.Super. 506, 510, 600 A.2d 568, 570 (1991). *Accord Commonwealth v. Lagana,* 510 Pa. 477, 483, 509 A.2d 863, 866 (1986).

 Regarding the initial ruling by the suppression court, our standard of review is limited to determining whether the factual findings of the lower court are supported by the record and whether the legal conclusions drawn from those facts are in error. *Commonwealth v. Chambers,* 528 Pa. 403, ——, 598 A.2d 539, 540 (1991);

*Commonwealth v. Smith*, 410 Pa.Super. 384, 388, 599 A.2d 1350, 1352 (1991).

> In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. If, when so viewed, the evidence supports the factual findings, we are bound by such findings and may only reverse if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Chiesa*, 329 Pa.Super. 401, 404, 478 A.2d 850, 851 (1984). *Accord Commonwealth v. Iannaccio*, 304 Pa.Super. 307, 450 A.2d 694 (1982), *aff'd*, 505 Pa. 414, 480 A.2d 966 (1984), *cert. denied*, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985).

■ On October 4, 1988, the lower court conducted a suppression hearing relative to appellant's motion to suppress an oral statement he allegedly made to Detective Mitchell F. Cooper of the Altoona Police Department on June 10, 1988. The suppression court found that at the time of the police investigation into Mr. Lascoli's murder, appellant was subject to supervision by the Juvenile Probation Office of Blair County. On June 10, 1988, appellant was taken into police custody pursuant to a bench warrant issued because of an allegation by the Juvenile Probation Office that he was in violation of his probation. The suppression court also found that after appellant was apprehended, he was taken to the Altoona Police Headquarters where Detective Cooper noticed open cut wounds on two of the fingers of appellant's left hand. Acting under the belief that information regarding the wounds would be needed by the staff at the Blair County Detention Home, Detective Cooper inquired as to the nature and source of the injuries. Appellant indicated that he had been "fooling around with a knife" with another friend.

The suppression court made five explicit factual findings which are crucial to resolving the issue before this court: (1) at the time of the conversation between appellant and Detective Cooper, appellant was not a suspect in the police

518

investigation of Mr. Lascoli's death; (2) appellant's custodial status in no way related to the murder investigation; (3) the police investigation of the murder had not yet focussed upon appellant; (4) the conversation between Detective Cooper and appellant was not designed nor intended by the officer to elicit information regarding Mr. Lascoli's murder; and (5) on June 10, 1988, appellant was not given the prophylactic warnings regarding his constitutional rights prescribed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Suppression Court Memorandum, docketed January 4, 1991 at 2–3. Our careful scrutiny of the suppression hearing and preliminary hearing transcripts supports these factual findings, and we discern no lower court error in this regard.[13]

On the basis of the foregoing factual findings, the suppression court concluded, as a matter of law, that appellant was not entitled to notice of his *Miranda* rights and that the oral statement in question was not obtained in violation of any constitutional right. We agree with this ruling. *Miranda* warnings are necessary only when a suspect is undergoing actual custodial interrogation. *Commonwealth v. Fento,* 363 Pa.Super. 488, 492, 526 A.2d 784, 786 (1987), *allocatur denied,* 517 Pa. 621, 538 A.2d 875 (1988). Our supreme court has defined "interrogation" as police conduct "calculated to, expected to, or likely to, evoke admissions." *Commonwealth v. Whitley,* 500 Pa. 442, 445, 457 A.2d 507, 508 (1983). "[A]bsent any notion of interrogation, the statement is classified as a volunteered statement, gratuitous and not subject to suppression for lack of warnings." *Id.* In light of the suppression court's properly supported factual finding that the conversation between Detective Cooper and appellant was not designed nor intended to elicit an admission, we discern no error of law in the lower court's decision to refuse suppression of the

13. *See* N.T. 10/4/88 at 23–26 (wherein defense counsel stipulated his acceptance of Detective Cooper's preliminary hearing testimony); N.T. 8/3/88 at 46–55 (Detective Cooper's testimony).

challenged statement.[14]

 The first part of appellant's seventh numbered contention is that the trial court erred in permitting the admission of improper rebuttal testimony. In its entirety, appellant's argument consists of the following bald allegation: "That Ella Jo Flemming saw Timothy McCall with blood all over the front of his shirt at about midnight on the night of the murder is not made less probable by the fact that Cindy Brown and Shavet Johnson may have seen him with a little blood on his wrist, at another location several city blocks across town, more than two months later." Appellant's brief at 61. We cannot decipher the crux of the question presented by this cryptic statement. We must deem an issue abandoned where it has been identified on appeal but not properly developed in the appellant's brief. *Commonwealth v. Nelson*, 389 Pa.Super. 417, 422–23, 567 A.2d 673, 676 (1989), *allocatur denied*, 527 Pa. 623, 592 A.2d 44 (1990). We note, moreover, that the instant case is unlike the situation of *Commonwealth v. Cooper*, 333 Pa.Super. 559, 482 A.2d 1014 (1984), where the panel was able, with difficulty, to review claims advanced by an inadequate argument. The trial record in this case consists of sixteen volumes of transcripts comprising well in excess of two thousand seven hundred pages of testimony. We are whol-

**14.** We note that appellant has correctly argued that a determination of whether a juvenile has knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances. *Commonwealth v. Williams*, 504 Pa. 511, 475 A.2d 1283 (1984). The relevant circumstances include a consideration of the juvenile's age, experience, comprehension and the presence or absence of an interested adult. *Commonwealth v. Morningwake*, 407 Pa.Super. 129, ——, 595 A.2d 158, 160 (1991), *citing Williams, supra*. Although the preliminary hearing transcript documents the fact that appellant was not accompanied by an interested adult at the time he conversed with Detective Cooper, appellate counsel has not fully expanded this argument by stating appellant's age on the relevant date, and by discussing his experience and comprehension level at that time. We conclude, however, that appellant has not been prejudiced by these lacunae since the inquiry is simply not germane. Appellant was never subject to a custodial interrogation within the meaning of the relevant case law on June 10, 1988, and his *Miranda* rights therefore never attached. *See Commonwealth v. Whitley, supra; Commonwealth v. Fento, supra.*

ly unable to review appellant's claim absent a proper argument containing references to specific locations in the record substantiating the averments. We decline to become substitute counsel for appellant in this matter and deem the issue waived.

 The final claim which we will explicitly address concerns the lower court's alleged error in denying the requested points for charge. In this regard, the entire argument presented consists of the following statement: "Authorities supporting the requested defense instructions were cited to the court in the text of its original points for charge; further authorities were cited in its brief to the lower court. The defense here simply stands by its assertion of error." Appellant's brief at 61. We find these averments wholly inadequate to facilitate substantive review of the issue because an appellate brief is simply not an appropriate vehicle for the incorporation by reference of matter appearing in previously filed legal documents. *See Commonwealth v. Osteen,* 381 Pa.Super. 120, 124, 552 A.2d 1124, 1126 (1989). The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with citation to pertinent authorities. Pa.R.A.P., Rule 2119(a), 42 Pa.C.S.A. As appellant's contentions have not been appropriately developed, we deem the argument waived under *Commonwealth v. Nelson, supra.*

Regarding the remaining issues before this court, we have carefully weighed the arguments advanced by both appellant and by the Commonwealth. Our close scrutiny of the certified record has convinced us that there is no merit to any of these contentions. We agree with the rationale espoused by the Honorable Ellis Van Horn in the opinion he filed on May 10, 1991. We therefore affirm on that basis with regard to the remainder of appellant's contentions.

Judgment of sentence affirmed.