245 N.J. Super. 428 (1991)
586 A.2d 250
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BART L. THOMAS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 7, 1990.
Decided January 16, 1991.
*429 Before Judges PRESSLER, DEIGHAN and BAIME.
Wilfredo Caraballo, Public Defender, attorney for appellant (Lowell Espey, Designated Counsel, of counsel and on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Robin Parker, Deputy Attorney General, of counsel and on the letter brief and supplemental letter brief).
Bart L. Thomas, appellant, filed a pro se supplemental statement.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Following a jury trial defendant Bart L. Thomas was convicted of the first-degree kidnapping and forcible rape of two teenage girls, N.J.S.A. 2C:13-1b(1) and N.J.S.A. 2C:14-2, as well as related lesser offenses. He was sentenced to an aggregate prison term of 20 years subject to a seven-year period of parole ineligibility.
The crimes were committed in October 1983. The two victims, A.R. and D.K., then 14 and 13 years old respectively, were walking home from a party at their Newark High School at about 11:00 p.m. They chose the most direct route, which took them through a park. They were there accosted by a gunwielding assailant who forced them into his car, placed them in the back seat and drove them to a deserted area, about fifteen minutes away. There he forced them in turn into the front seat, raping each of them. He then drove them back to where he had found them. The girls ran home, reported the rape to their families, and were taken to a local hospital, where rape *430 kits were assembled which included vaginal smears and other cytological material. Two days later, the girls were brought to police headquarters where each separately viewed several books of photographs. Each separately identified defendant's as that of their assailant. Several days later, one of the girls, A.R., while walking to school, saw the man she believed to be her assailant in the same car in which she had been abducted. She telephoned her mother with this information but did not then tell the police. The indictment charging defendant with the crimes was returned in January 1985.
Trial was originally scheduled on a try or dismiss basis for August 1987. That trial was preceded by a Wade hearing, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Following the hearing, the trial judge ruled that the victims' photographic identification was inadmissible because of the police failure to explain why no record had been made of the photographs used in the identification procedure. We granted the State's motion for leave to appeal and reversed by our opinion filed on February 8, 1988, under Docket No. A-280-87T5. Because of the delay occasioned by the interlocutory appeal, the delay in the return of the indictment, and the unaccounted for delay between the return of the indictment and the Wade hearing, it was not until May 1988, some four and a half years after the commission of the crimes, that trial finally took place.
The State's sole witnesses at trial were the two victims, now young women, and the mother of one of them. The State's case depended entirely on the victims' out-of-court and in-court identifications. No other evidence linking defendant with the crimes was adduced. Defendant, who had prior drug and robbery convictions, did not testify. His sole witness was his employer, who testified that as far as he knew, defendant had no car, did not drive and could not drive. Payroll records, moreover, suggested that defendant was at work in Irvington at the time A.R. sighted her assailant while walking to school. Based on this testimony and the discrepancies between the *431 victims' initial physical description and defendant's actual appearance, the defense was misidentification.
After the jury returned its guilty verdicts, defendant moved for an order compelling the State to make the rape kit available for DNA testing. The motion was heard just prior to the scheduled sentencing. The gist of defendant's argument was that DNA testing is highly accurate but expensive since it was performed in this country by only three commercial laboratories. Counsel explained that he had asked, indeed "begged," the prosecutor to have the test performed at State expense but the prosecutor had refused. He did not, he argued, pursue the matter by a pretrial motion both because his client could not afford the expense of the test and the fees of the expert witnesses who would have to testify and because admissibility of DNA test results was, in his view, questionable. At the time the post-trial motion was made, no New Jersey court had in fact ruled on the admissibility of DNA testing in a reported opinion and insofar as we are aware, none has done so since. The prosecutor's response to the motion was that as a matter of office policy, evidence was not released for commercial testing and the F.B.I., which was then preparing facilities for the conducting of DNA testing, was not yet ready to undertake it. The prosecutor also argued that the motion came too late. She contended that since it could have been made prior to trial, the defense, by choosing not to do so, had made a binding strategic decision to forego DNA testing and whatever favorable evidence that testing would produce.[1] The trial judge agreed that defendant was not, in these circumstances, entitled to a "second bite of the apple," denied the motion, and proceeded to sentence defendant.
*432 We reverse the order denying the motion to compel the test. We do so even if we were to assume that the trial judge was essentially correct in interpreting defense counsel's conduct as a strategic decision, a matter we discuss hereafter. We note that the State's case against defendant was not strong, the identifications were uncorroborated except by each other, and the defense, based on defendant's inability to drive a car[2] and his apparent presence at work in Irvington at the time the assailant was seen in Newark, appeared sufficient in the circumstances to raise a reasonable doubt as to his guilt. Defense counsel may well have believed his client would be acquitted without incurring either the risk or expense of perhaps inadmissible DNA testing.
It is clear that ordinarily a criminal defendant will be bound by strategic choices. But as Justice Handler said, writing for this court in State v. Harper, 128 N.J. Super. 270, 277, 319 A.2d 771 (App.Div. 1974), certif. denied, 65 N.J. 574, 325 A.2d 708 (1974), relief must be afforded from tactical errors which "cut mortally into the substantive rights of the defendant." We can conceive of no course of action by counsel as more nearly affecting a defendant's substantive rights than a failure to pursue competent evidence which might conclusively prove his innocence of the crime charged. And we can conceive of no greater injustice, when that evidence is available, of depriving a convicted defendant of access to it. The prosecutor, the court, and the judicial system have an obligation to protect the innocent which is no less fundamental than the obligation to punish the guilty.
Our conclusion that defendant must now be afforded the opportunity for DNA testing of the rape kit rests upon scientific and concomitant judicial developments of the last several years in respect of that procedure. To begin with, DNA testing *433 is based on the scientifically accepted understanding that DNA (deoxyribonucleic acid) contains information providing each person with an individual genetic blueprint. DNA itself is a long threadlike chain of molecules found in every cell with a nucleus in every living organism. The DNA is a double helix in which two chains of nucleotides, running in opposite directions are held together between pairs of bases which look like rungs on a ladder. Each rung is composed of two bases which are linked by hydrogen bonds. The compound bases attach in four possible combinations: A-T, T-A; or C-G, G-C. No other combination is possible. Each sequence of three pairs of bases is a codon and groups of codons form genes. The gene is the unit of inheritance for living organisms. Long segments of DNA are the same from person to person because these genes build the necessary organs that characterize the human body  the head, lungs, heart, etc.. However, certain parts of the DNA, called polymorphisms, are highly variable from one person to another, and, but for identical twins, no two people have the same sequential pattern for these areas. DNA testing is based upon obtaining a DNA profile by a process referred to as Restriction Fragment Length Polymorphism Analysis. See Andrews v. State, 533 So.2d 841, 847-848 (Fla. Dist. Ct. App. 1988); People v. Wesley, 140 Misc.2d 306, 533 N.Y.S.2d 643, 645-649 (Co.Ct. 1988). This process and its extraordinary degree of accuracy in matching cellular material to individuals is described at length and with particularity in United States v. Jakobetz, 747 F. Supp. 250 (D.C.Vt. 1990).
Within the last two years, the acceptance of the methodology of DNA testing by the scientific community has led to virtual judicial unanimity, despite some earlier reservations, in ruling that DNA test results are admissible if they are supported by an adequate evidential base. See, in addition to Jakobetz, supra, People v. Castro, 545 N.Y.S.2d 985, 144 Misc.2d 956 (Sup.Ct. 1989); Andrews v. State, supra; Cobey v. State, 80 Md. App. 31, 559 A.2d 391 (1989); State v. Schwartz, 447 N.W.2d 422 (Sup.Ct.Minn. 1989); and see People v. Wesley, *434 supra. See also Thompson and Ford, DNA Typing: Acceptance and Weight of the New Genetic Identification Tests, 75 Va.L.Rev. 45 (1989); Annotation, Admissibility, In Prosecution for Sex-Related Offense, of Results of Tests on Semen or Seminal Fluids, 75 A.L.R. 4th 897, 905-906, 948-949 (1990). This recent literature leaves little doubt of the enormous utility of DNA testing, suggesting that the time may be close at hand when genetic blueprint evidence will be as routine and decisive as fingerprint evidence, and suggesting further that the State's failure to submit material to DNA testing may well implicate its obligation to reveal exculpatory evidence. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
This much at least is clear. According to Jakobetz, supra, the F.B.I. is now equipped to perform reliable DNA testing. While we do not now decide whether, and if so on what evidential base, DNA test results will be admissible in a criminal trial in this State  that decision should be made upon a proper factual record  it is at least evident that there is a high probability of admissibility of such evidence when properly offered. Under these circumstances, considerations of fundamental fairness demand that the testing of this now seven-year old rape kit material be done now either by the F.B.I. or by one of the three commercial laboratories as the parties agree or the court shall direct.
We make this further observation. As the literature makes abundantly clear, it was not until three years ago that DNA testing was performed by commercial laboratories for the purpose of producing evidence in criminal cases. It was not until two years ago that the issue of admissibility of this evidence reached the courts. Most of the literature and most of the relevant judicial decisions came after the argument of defendant's motion in this case. We do not believe that defendant can be burdened with having had to anticipate a scientific/judicial revolution. The state of the art and the state of the law respecting DNA testing were, when this case was prepared for trial, in their earliest, most tentative stages. We cannot evaluate *435 defense counsel's choice by what we now know but only by what he was reasonably chargeable with knowing. He did seek the prosecutor's agreement to submit the material at State expense for DNA testing. His course of action thereafter, in view of his reasonable concerns over admissibility and expense, was not unjustified. We note that an Alabama court has recently held that counsel's failure to demand DNA testing of seminal fluid found on the person of a rape victim did not, in 1982 when the case was tried, constitute ineffective assistance of counsel in view of the scientific/judicial chronology, that is, that the first use of DNA "fingerprinting" in a criminal trial was in England in 1985 and no such evidence was even available in this country for such use until 1987 or 1988. See Kennedy v. State, 545 So.2d 214, 217-218 (Ala. Crim. App. 1989). Fortunately, and apparently unlike Kennedy, the rape kit here is still intact and still in the prosecutor's possession.
We understand the perception of our dissenting colleague that permitting the rape kit to be tested now, based on an application made after the verdict, appears to reward a defense counsel who chooses to gamble with the proofs. We agree that ordinarily it is not the judicial function to hedge the bets made by the defense. Nevertheless, it hardly needs saying that these gaming metaphors are only metaphors. A criminal trial is not a lottery, a spin of the roulette wheel or a throw of the dice. The orderly processing of cases through the court is an important value, but it is not the end in itself. It is only the method by which we attempt to achieve the ultimate purpose of the criminal justice system  the fair conviction of the guilty and the protection of the innocent. That is what our constitutional guarantees are all about. Our system fails every time an innocent person is convicted, no matter how meticulously the procedural requirements governing criminal trials are followed. That failure is even more tragic when an innocent person is sentenced to a prison term. The philosophical difference between us and the dissenter is clear. We regard it as more *436 important to rectify that failure than to chastise an attorney whose conduct may have abused the system.
The dissent notes, in rather pejorative terms, that "lurking beneath the majority's opinion is the lingering suspicion that the jury convicted the wrong man." That suspicion does not lurk. It is the basic predicate of our decision. Victim identification, however sincere, is notoriously unreliable. The other proofs offered here contradicted the reliability of the identifications, which were the sole evidence against defendant. There was proof that he could not drive a car and that he was in a different city when one of the victims claimed later to have seen him. At the time of trial DNA testing was relatively untried and unproved in this jurisdiction. There is a possibility, if not a probability, that DNA testing now can put to rest the question of defendant's guilt. The dissent accuses our decision to permit the testing of creating a precedent that "tears at the very roots of the defense bar's trial responsibility." We would rather tear at those roots, if that is really what we are doing and we doubt that we are, than sit by while an innocent man, in the words of the dissent, "languishes in prison while the true offender stalks his next victim." In our jurisprudential system, we punish criminal defendants for their crimes, not for their attorneys' mistakes.
The precedent we create here, if any, is that in a criminal case, when the State's proofs are weak, when the record supports at least a reasonable doubt of guilt, and when there exists a way to establish guilt or innocence once and for all, we will not elevate form so highly over substance that fundamental justice is sacrificed.
Defendant has raised other challenges to the conviction. He argues, as a matter of plain error, that the court erred in failing to charge the jury as to the lesser included offense of criminal restraint and that the prosecutor denied him a fair trial by asserting in her summation that the victims had identified defendant at separate trials. Our review of the record satisfies *437 us that both of these contentions are clearly without merit. R. 2:11-3(e)(2).
We reverse the order denying defendant's motion for DNA testing of the rape kit material and cell samples supplied by him. We remand to the trial judge for entry of an order either by consent of the parties or after their opportunity to be heard providing for the testing. If the test results are either inconclusive or indicate that defendant was the assailant, the conviction shall stand. If the test results indicate that defendant was not the assailant, the trial court may either conduct an in limine hearing on admissibility or order a new trial.
BAIME, J.A.D., dissenting.
These are the critical facts. Following a jury trial, defendant was found guilty of two counts of first-degree kidnapping (N.J.S.A. 2C:13-1b(1)) and two counts of forcible rape (N.J.S.A. 2C:14-2). The record discloses that on October 29, 1983, fourteen year-old A.R. and her thirteen year-old friend D.K. were walking across Green Acres Park in Newark when they were accosted by a man, taken at gun-point to his car, driven to a secluded area behind an abandoned building and brutally raped. Both victims later made independent photographic identifications of defendant from a book of mug shots.
At trial, defendant was represented by a highly experienced and talented attorney assigned by the Public Defender's Office. Although defense counsel allegedly requested the prosecutor to have DNA testing performed at State expense, no pretrial motion was made for access to the rape kit for this purpose. Nor is there anything in the record to suggest that defense counsel sought DNA testing through the Public Defender's Office, see N.J.S.A. 2A:158A-5; cf. State v. Manning, 234 N.J. Super. 147, 158-159, 560 A.2d 693 (App.Div. 1989), certif. denied 117 N.J. 657, 569 A.2d 1351 (1989); State v. Stockling, 160 N.J. Super. 486, 490, 390 A.2d 648 (App.Div. 1978), or otherwise attempted to obtain public funds for expert assistance or *438 trial preparation. See Ake v. Oklahoma, 470 U.S. 68, 78, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53, 63 (1985); compare State v. R.G.D., 108 N.J. 1, 527 A.2d 834 (1987) and State v. Green, 55 N.J. 13, 258 A.2d 889 (1969) with State v. Williams, 46 N.J. 427, 217 A.2d 609 (1966). Instead, counsel was content to challenge the accuracy of the victims' identifications of defendant, and to highlight the failure of the prosecutor to avail himself of scientific tests respecting semen found on the two teenagers' clothing.
This court now reverses the Law Division's post-conviction order denying the defense's belated request for access to the rape kit for the purpose of DNA testing. The court takes this course despite its professed view that defense counsel's failure to seek DNA testing prior to trial was in furtherance of tactical aims.[1] In my view, the result reached by the majority constitutes an unwholesome and dangerous precedent that tears at the very roots of the defense bar's trial responsibility. The practical effect of the majority's decision is to place trial judges in the unenviable position of compelling all defendants charged with rape to undergo DNA testing regardless of the wishes of their attorneys, or risk a later attack on the resulting conviction. Defense counsel will perceive a tactical advantage in inaction with the corresponding hope that any error will be corrected on appeal.
Lurking beneath the majority's opinion is the lingering suspicion that the jury convicted the wrong man. The majority's attempt to grant the defense one "last bite at the apple" is a *439 very human response. The possibility that an innocent man languishes in prison while the true offender stalks his next victim is a fear that besets all appellate judges. In this case, where the State's evidence consisted exclusively of eyewitness identification testimony, the majority understandably wishes to afford the defendant one last opportunity to refute the jury's verdict. If we could limit ourselves and the reach of this decision to only this case and only this defendant, I might well join the course adopted by the majority.
We would be myopic, however, if we saw no more than the defendant before us. Instead, the issue must be considered in the context of the values involved. It is a sad fact that the capacity of the judicial process to deal with the demands of law enforcement is doubted by a substantial segment of responsible people. The reasons are several. One is the lengthening line of decisions that fails to accord finality to the determinations of juries in criminal cases, based upon belated challenges to a trial practice or course which was not the subject of a timely objection by defense counsel. It is not uncommon for an appellate court to vitiate an otherwise valid conviction long after the criminal event based upon a newly perceived error raised for the first time on appeal. Although our rules of practice seemingly forbid it, see R. 1:7-5; R. 2:10-2, and our Supreme Court has admonished against it, see State v. Macon, 57 N.J. 325, 273 A.2d 1 (1971), all too often criminal trials are viewed from the vantage point of twenty-twenty hindsight, the trial judge never having been alerted to an error first raised on appeal. The public is understandably confused and may wonder how the trial bench could be so grievously unjust as to allow so flagrant an error to occur. Yet, we judges know full well that commonly a decision regarding the fairness of a trial practice involves no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law. Cf. State v. Funicello, 60 N.J. 60, 72, 286 A.2d 55 (1972) (Weintraub, C.J., concurring), cert. denied 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972).
*440 It is idle to suppose that our decisions, whether published or not, have no real impact on the trial bar or at the worst a minimal one. The realities abound the other way. By recognizing defendant's belated challenge, we reward a litigant who sought a tactical advantage in his failure to act. We implicitly encourage the defense bar to "lie in wait." We subject trial judges to unfair pressures and unceasing scrutiny. And we unwittingly add to the popular notion, however untrue, that freedom can be purchased by a lawyer's bag of tricks.
I do not dispute the thesis that there must be some safety valve to insure that an innocent person is not imprisoned. However, our practice offers every opportunity for a fair trial. Unless there is some order in the trial of cases, we cannot hope to meet the swollen demands upon our system of criminal justice. Absent a Sixth Amendment violation, I would not recognize the frailty of a conviction based upon a course not taken for tactical reasons.
Before leaving the subject, I am compelled to add several brief comments concerning the majority's perception of this dissent. Contrary to the majority's thesis, I do not seek to punish a defendant for the sins of his attorney. Defense counsel committed no sin. Rather, he carefully considered the possible consequences and determined that it would be disadvantageous for his client to obtain his own expert for the performance of DNA testing. Instead, he chose to attack the State's case on the basis that no testing was performed. The majority now questions that strategy from the prism of afterthought, and suggests that we now offer an avenue for a road deliberately not taken. In attempting to do justice to the defendant, I submit the majority does justice to no one. Rather, the majority opinion dilutes the responsibility of the defense bar and encourages a sporting view of justice that I cannot countenance and our system cannot tolerate.
I would affirm the Law Division's order.
NOTES
[1] The State's argument, we note, is somewhat disingenuous since the import of its position was that it might have resisted the motion whenever made. In that case, of course, it is impossible to foretell whether a timely motion would have been granted or not.
[2] No evidence was produced either that defendant had or did not have a New Jersey driver's license or that an automobile was or was not registered in his name. See Evid.R. 63(13) and (14).
[1] I harbor no doubt that defense counsel's failure to act constituted a deliberate strategic decision. It is true that the defense would not have been required to disclose an unfavorable DNA test result. See State v. Mingo, 77 N.J. 576, 392 A.2d 590 (1978). However, in a practical sense, such a course would have propelled the prosecutor to independently have DNA testing performed. By doing nothing, defense counsel obtained the benefit of an inference that had the State performed scientific tests the result would have been unfavorable to the prosecution. As I have noted, defense counsel forcefully argued this point in his summation.