618 A.2d 420

**COMMONWEALTH of Pennsylvania**

v.

**Dale BRISON, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 13, 1992.

Filed Dec. 10, 1992.

Vincent P. DiFabio, Paoli, for appellant.

Terry Heyman, Asst. Dist. Atty., West Chester, for Com., appellee.

Before McEWEN, CIRILLO and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from the judgment of sentence entered following appellant's convictions for one count of rape,[1] kidnapping,[2] aggravated assault[3] and carrying a prohibited offensive

---

1. 18 Pa.C.S.A. § 3121(1) and (2).
2. 18 Pa.C.S.A. § 2901(a)(3).
3. 18 Pa.C.S.A. § 2702(a)(1) and (4).

weapon,[4] and three counts of involuntary deviate sexual intercourse.[5] Appellant presents the following issues for our review: (1) whether the verdict was against the evidence and/or the weight of the evidence; (2) whether appellant's constitutional right to a fair trial was violated by the Commonwealth's failure to comply with appellant's request for DNA testing; and (3) whether appellant was denied his constitutional right to a fair trial and effective representation by the trial court's failure to grant appellant's request for DNA testing in light of appellant's indigent status. For the reasons set forth below, we vacate the judgment of sentence and remand for further proceedings consistent with the following discussion.

Before proceeding to address the questions raised by appellant, it is necessary to briefly recount the relevant facts of this case. Shortly after midnight on July 14, 1990, the victim[6] left her apartment and proceeded towards Penn Supreme, a late-night convenience store. As she approached the store, the victim observed an individual, whom she later identified as appellant, Dale Brison, standing near a pay telephone. The victim continued walking when appellant suddenly approached her and placed one hand about her throat and the other about her waist. The victim heard a clicking noise, similar to a switchblade knife being opened, and experienced a sharp pain in her left side. The victim then fainted for a brief period of time. When she regained consciousness, she found herself walking on another street with appellant's hands still about her throat and waist. The victim tried to escape from appellant by attempting to sit down near some stone pillars and by grabbing onto a sign. The victim also screamed. The victim's efforts to escape were thwarted by appellant who threatened the victim and instructed her not to scream. Appellant ultimately led the victim into briar bushes located outside of an apartment complex. Appellant removed the victim's raincoat, her left shoe and sock, and the left leg of her jeans. Appellant

**4.** 18 Pa.C.S.A. § 908(a).

**5.** 18 Pa.C.S.A. § 3123(1) and (2).

**6.** The female victim was approximately thirty-seven years of age at the time of the incident.

then forced the victim to perform and/or submit to multiple acts of fellatio and cunnilingus. Appellant also vaginally and anally raped the victim several times. After completing his brutal assault, appellant released the victim at approximately 2:45 a.m.

When the victim arrived at her home, she discovered that she was heavily bleeding from the stab wounds inflicted by appellant. The victim also had abrasions on her neck and hand which were sustained during the incident. The victim contacted the police who transported her to the hospital where she was treated for her injuries. A rape kit was also performed on the victim.[7]

Although the victim had observed appellant in the neighborhood, she did not know his name. The victim accompanied the police on several outings in an attempt to identify her assailant. On the third outing, the victim noticed appellant and mentioned this to the officer after they had walked past a group of individuals with whom appellant was standing. However, appellant had disappeared by the time the victim and the police officer returned for a closer look. Several days later, the victim observed a group of individuals standing outside her apartment building and became visibly upset when she recognized appellant in the crowd. A friend of the victim's, who was driving past, noticed the victim's distraught state and escorted her to the police station. The victim described appellant to her friend, who had also seen appellant. The victim's friend, who knew appellant, informed the police of his identity. Appellant was thereafter arrested and charged with various offenses arising out of this incident.

A jury trial was held in June 1991, following which appellant was convicted of the above crimes. Post-trial motions were filed and denied. Appellant was subsequently sentenced on February 25, 1992 to an aggregate sentence of eighteen (18) to

7. Samples obtained from the rape kit and the victim's undergarments confirmed the fact that the victim had been raped. In addition, tests revealed that a hair sample found on the victim's body was consistent with that of appellant.

forty-two (42) years' imprisonment.[8] This timely appeal followed.[9]

 Appellant first challenges the weight of the evidence presented.[10] Our scope of review regarding claims of this type has been enunciated as follows:

8. Specifically, appellant received a sentence of eight (8) to twenty (20) years for his rape and kidnapping convictions. These were directed to run concurrently with each other. Appellant was further sentenced to four (4) to ten (10) years' imprisonment on his conviction for aggravated assault; this sentence was directed to run consecutively with that imposed on appellant's rape and kidnapping convictions. Appellant was also given a six (6) to twelve (12) year sentence on each of his three convictions for involuntary deviate sexual intercourse. Although these sentences were directed to run concurrently with each other, they were to be served consecutively to appellant's other sentences. Finally, the lower court imposed a sentence of six (6) to twelve (12) months on appellant's conviction for possessing a prohibited offensive weapon; this sentence was directed to run concurrently with all of appellant's other sentences.

9. In his jurisdictional statement, appellant indicates that we may exercise jurisdiction over this appeal pursuant to Pa.R.A.P., Rule 341, 42 Pa.C.S.A. Appellant is in error. Jurisdiction over this appeal is vested in this court pursuant to § 742 of the Judicial Code, 42 Pa.C.S.A.

10. Appellant also argues that the verdict was against the evidence. Although this appears to be a reiteration of appellant's assertion that the verdict was against the weight of the evidence, we note that appellant recites the test for evaluating the sufficiency of the evidence with respect to this claim. Appellant's Brief at 10. It thus appears that appellant has confused and commingled his sufficiency and weight of the evidence claims. As explained by this court, these matters should not be confused as they involve discrete inquiries. *See Commonwealth v. Taylor*, 324 Pa.Super. 420, 424–425, 471 A.2d 1228, 1229–1230 (1984) (discussing the distinctions between and different tests for evaluating challenges to the sufficiency and weight of the evidence). In light of appellant's confusion, we will thus treat appellant's claim that the verdict was against the evidence as a challenge to the sufficiency of the evidence. In reviewing matters of this type, the test is:

[w]hether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence.

Whether a new trial should be granted on grounds that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge and his decision will not be reversed on appeal unless there has been an abuse of discretion.... The test is not whether the court would have decided the case the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Murray,* 408 Pa.Super. 435, 436–437, 597 A.2d 111, 112 (1991) (*en banc*), *allocatur denied,* 529 Pa. 668, 605 A.2d 333 (1992), *quoting Commonwealth v. Taylor,* 324 Pa.Super. 420, 425, 471 A.2d 1228, 1230 (1984). We will evaluate the evidence and appellant's arguments relating thereto in accordance with these principles.

In support of his attacks on the sufficiency and weight of the evidence, appellant claims that the evidence was deficient in that the victim was unable to make a positive identification due to a variety of factors. Appellant further argues that the evidence was inadequate because the physical evidence did not link appellant to the crimes and/or suggested that the victim was attacked by someone else. Finally, appellant contends that the evidence was deficient because he presented an uncontradicted alibi. Notwithstanding appellant's arguments to the contrary, he is not entitled to relief on this basis.

The victim unequivocally and consistently testified that she was able to observe her assailant for a substantial period of time despite the darkened location, rain and diminished lighting conditions. N.T. 6/3/91 at 9, 10, 12, 16, 18, 21, 22 and 77. Moreover, the victim has consistently identified appellant as the perpetrator of the crime. *Id.* at 26–29. Although the victim did not describe appellant's facial features or distinguishing facial characteristics to the police, the victim's lack of specific details was a matter for the jury to consider in evaluating the victim's credibility and does not render her

*Commonwealth v. Griscavage,* 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986), *quoting Commonwealth v. Harper,* 485 Pa. 572, 576–577, 403 A.2d 536, 538–539 (1979).

otherwise positive identification inherently unreliable. With regard to the physical evidence, *i.e.*, appellant's clothing, jewelry and the footprints obtained from the site of the assault, there is no question that these items either were not recovered or failed to conclusively connect appellant to the crime. The absence of such evidence, however, is not fatal to the Commonwealth's case. Again, the absence of such evidence was a factor for the jury to consider in assessing the credibility of the victim.

The same analysis is applicable to appellant's alibi and misidentification defenses. Appellant's alibi was that he was at home watching television with his mother. Contrary to appellant's argument, appellant's alibi evidence was sufficiently rebutted by the victim's testimony and no other additional evidence was required. The jury evidently rejected appellant's alibi and mistaken identity theories and resolved the conflicting versions against appellant. In light of the evidence presented by the Commonwealth, we discern nothing shocking about the jury's verdict which makes the award of a new trial imperative. We likewise conclude that the Commonwealth's evidence was more than sufficient to establish all of the elements of the crimes for which appellant was convicted. Appellant thus is not entitled to either a new trial or an arrest of judgment on this basis.

■ Appellant next asserts in his second and third allegations of error that he was denied due process because both the Commonwealth and the lower court failed to have DNA testing performed on samples taken from the victim despite appellant's repeated requests and indigent status. As these matters are intertwined, they will be discussed together. Neither of the parties refers us to any relevant authority which is dispositive of appellant's claims. Our own research likewise has not disclosed any apposite Pennsylvania cases. We have nevertheless uncovered several decisions from our sister states which have had the opportunity to address questions similar to that now raised by appellant. These decisions are summarized as follows.

The New York courts first examined this question in the case of *In the Matter of Dabbs v. Vergari,* 149 Misc.2d 844, 570 N.Y.S.2d 765 (Sup.Ct.Westchester Co.1990). In *Dabbs,* the defendant was tried and convicted, and his convictions were ultimately affirmed on appeal; DNA testimony was not available at the time of the defendant's trial. The defendant subsequently sought post-conviction discovery relating to DNA testing. In granting the defendant's request, the court reasoned:

it is well established that, notwithstanding the absence of a statutory right to post-conviction discovery, a defendant has a constitutional right to be informed of exculpatory information known to the State[.] *[S]ee generally Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 216 [215] (1963).... A corollary to the duty of disclosure is the duty to preserve exculpatory material[.] ... By a parity of reasoning, where evidence has been preserved which has high exculpatory potential, that evidence should be discoverable after conviction. Due process is not a technical conception with a fixed content unrelated to time, place and circumstances. It is flexible and calls for such procedural protections as the particular situation demands. Clearly, an advance in technology may constitute such a change in circumstance[.] ... [I]f [defendant] were to be tried now, he would be entitled to DNA testing of the physical evidence. The need for testing is analogous to that considered in [cases] where the evidence was a controlled substance. [In such cases, a] defendant's guilt or innocence h[a]ng[s] exclusively on the nature and amount of the substance in question. For refutation of the charges against him, there [i]s no acceptable alternative to scientific testing by experts of his choice. Similarly, in this case, while it is unclear what [DNA] testing will ultimately reveal, ... [i]f DNA testing could exclude semen from the attacker as belonging to [defendant], it would strongly impeach the credibility of the victim's identification of [defendant]. [To] deny [defendant] the opportunity to prove his innocence with such evidence simply to ensure the finality of convictions is untenable.

*Id.,* 149 Misc.2d at 847–850, 570 N.Y.S.2d at 767–769 (citations omitted).

The New York court revisited a similar issue in *People v. Callace,* 151 Misc.2d 464, 573 N.Y.S.2d 137 (Suffolk Co.Ct. 1991), in which the defendant again requested that post-conviction DNA testing be performed despite the fact that such testing was not available at the time of his trial. Although the court disagreed with the exculpatory evidence analysis applied in *Dabbs,* it nevertheless granted the defendant's request on the basis that DNA testing of the samples constituted after-discovered evidence. *Id.,* 151 Misc.2d at 464, 573 N.Y.S.2d at 139–140.

The New Jersey Superior Court has likewise considered the question of a defendant's post-conviction entitlement to DNA testing in *State v. Thomas,* 245 N.J.Super. 428, 586 A.2d 250 (App.Div.1991). In *Thomas,* DNA tests were not performed at the time of the defendant's trial. Prior to sentencing, the defendant requested that the prosecutor have the test performed at the state's expense, due to the exorbitant cost of the test. The defendant further filed a motion seeking to compel the state to make the rape kit performed on the victim available for testing. On appeal, the court discussed DNA testing as well as its evolution as a diagnostic tool in criminal cases and suggested that the state's failure to submit material for DNA analysis may implicate its obligation to reveal exculpatory evidence, as set forth in *Brady v. Maryland. Id.,* 245 N.J.Super. at 432–434, 586 A.2d at 252–253. In concluding that considerations of fundamental fairness required the DNA testing, the court explained:

> Our system fails every time an innocent person is convicted, no matter how meticulously the procedural requirements governing criminal trials are followed. That failure is even more tragic when an innocent person is sentenced to a prison term.... We regard it as ... important to rectify that failure.... Victim identification, however sincere, is notoriously unreliable. The other proofs offered here contradicted the reliability of the identifications, which were the sole evidence against defendant.... There is a possibility,

if not a probability, that DNA testing now can put to rest the question of defendant's guilt.... We would rather [permit the testing] than sit by while a [possibly] innocent man ... languishes in prison while the true offender stalks his next victim.... The precedent we create here, if any, is that in a criminal case, when the State's proofs are weak, when the record supports at least a reasonable doubt of guilt, and when there exists a way to establish guilt once and for all, we will not elevate form so highly over substance that fundamental justice is sacrificed.

*Id.,* 245 N.J.Super. at 435–436, 586 A.2d at 254.

The Indiana appellate court has also spoken on this issue. Finding the New York and New Jersey cases persuasive, Indiana has authorized DNA tests to be performed despite the fact that such testing was not available at the time of the defendant's trial. *Sewell v. State,* 592 N.E.2d 705, 707–708 (Ind.App.Dist. 3 1992). In support of its decision, the court stated:

Advances in technology may yield potential for exculpation where none previously existed. The primary goals of the court when confronted with a request for the use of a particular discovery device are the facilitation of the administration of justice and the promotion of the orderly ascertainment of truth. Moreover, where the State possesses exculpatory evidence, such evidence is discoverable notwithstanding a lack of strict compliance with normal discovery procedures.... The potential for exculpation by DNA comparison parallels the potential for accurate identification. Therefore, *Brady [v. Maryland]* is implicated in post-conviction requests for forensic tests only where a conviction rested largely on identification evidence and advanced technology could definitively establish the accused's innocence.

*Id.,* 592 N.E.2d at 708.

The courts of Minnesota and Connecticut have similarly found DNA testing to implicate the concerns at issue in *Brady v. Maryland. See State v. Schwartz,* 447 N.W.2d 422, 427 (Minn.1989) (providing that constitutional concerns addressed in *Brady* encompass information relating to DNA testing

because such evidence is material to the issue of guilt and could have an impact on the trial outcome; accordingly, such evidence must be disclosed to the defendant) and *State v. Hammond*, 221 Conn. 264, 290–296, 604 A.2d 793, 806–808 (1992) (indicating that state's failure to have DNA tests performed on the vaginal swabs taken from the victim where DNA tests previously performed on the victim's clothing exculpated the defendant may have constituted a breach of duty to disclose exculpatory evidence which would have affected the outcome of the case). *But see Arizona v. Youngblood*, 488 U.S. 51, 58–59, 109 S.Ct. 333, 337–338, 102 L.Ed.2d 281, 290 (1988) (providing, in *dicta*, that the due process clause is not violated when the police fail to use a particular investigatory tool, such as a newer test, on semen samples).

We find the reasoning expressed by the courts of our sister states to be persuasive and compelling. The DNA testing process has been acknowledged by the courts as well as the national scientific community for its extraordinary degree of accuracy in matching cellular material to individuals. *See State v. Thomas*, 245 N.J.Super. at 433–434, 586 A.2d at 252–253; *Commonwealth v. Rodgers*, 413 Pa.Super. 498, 511, 605 A.2d 1228, 1235 (1992) and the authorities and literature referenced therein. Since its use in the legal forum, nearly all of the decisions which have considered whether DNA test results are admissible, including Pennsylvania, have permitted such evidence to be admitted.[11] *See State v. Montalbo*, 73 Haw. 130, 144–145, n. 7, 828 P.2d 1274, 1283 n. 7 (1992); *Commonwealth v. Rodgers, supra.* And as scientific technology continues to advance, DNA analysis may eventually become as widely accepted as routine and decisive as fingerprint or other types of evidence. *State v. Thomas*, 245 N.J.Super. at 434, 586 A.2d at 253.

In view of the wide acceptance and admissibility of DNA test results and the ability of such testing to accurately and definitively inculpate or exclude an individual as the perpetra-

11. DNA evidence has been excluded in a few jurisdictions because of error in performance of the test or inaccurate methods. *See State v. Montalbo*, 73 Haw. 130, 144–145, n. 7, 828 P.2d 1274, 1283 n. 7 (1992).

tor of the crime, we agree with appellant that DNA tests should have been performed on the samples taken from the victim in this case. The Commonwealth's evidence consisted primarily of the victim's identification testimony. However, the victim's stab wounds in addition to the weather and reduced visibility may well have affected the victim's ability to accurately view her assailant, and thus, she may have been prompted to identify appellant merely because she remembered seeing him in the neighborhood.[12] Moreover, the victim did not specifically describe any of her assailant's facial characteristics to the police. There was also no conclusive physical evidence, aside from a single hair sample which may have been consistent with any male of african-american descent, linking appellant to the crime. Had tests been conducted and found to exculpate or exclude appellant as the perpetrator, admission of the test results and the other evidence may well have provided sufficient reasonable doubt to secure an acquittal. In the alternative, inculpatory results would certainly have strengthened the Commonwealth's case by providing concrete corroboration of the victim's identification. Under these circumstances, principles of justice require us to vacate appellant's conviction and remand to the trial court for the performance of DNA analysis on the samples taken from the victim.[13]

12. The testimony at trial revealed that appellant and the victim lived on the same street within a few blocks of each other. N.T. 6/3/91, Vol. I, at 32 and N.T. 6/4/91, Vol. II, at 218.

13. Upon receipt of the test results, the trial court must ascertain whether appellant is entitled to a new trial. *See Commonwealth v. Brosnick*, 530 Pa. 158, 160–62, 607 A.2d 725, 727 (1992) (discussing standard for evaluating whether after-discovered evidence warrants the award of a new trial). In deciding this question, the trial court must necessarily consider whether the test results would be admissible. *See id.* This determination should be performed in accordance with our decision in *Commonwealth v. Rodgers,* 413 Pa.Super. at 507–515, 605 A.2d at 1233–1236 (discussing the admissibility of DNA test results). The judgment of sentence should be reinstated in the event that a new trial is not required.

Based on the record currently before us, we do not know whether the specimens taken from the victim are still available for testing. Our holding is thus contingent upon the continued existence of these materials. If the samples have not been preserved by the Commonwealth and

454

Judgment of sentence vacated. Remanded for further proceedings consistent with the foregoing discussion. Jurisdiction relinquished.

there is no hint of bad faith in failing to preserve the evidence, the judgment of sentence must be reinstated. *See, e.g., Arizona v. Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289 (1988) (holding that absent bad faith on the part of the police, the failure to preserve potentially useful evidence does not constitute a denial of due process of law); *Commonwealth v. Tillia,* 359 Pa.Super. 302, 310–314, 518 A.2d 1246, 1250–1252 (1986); *Commonwealth v. Gamber,* 352 Pa.Super. 36, 42–44, 506 A.2d 1324, 1327–1329 (1986) (same).