748 A.2d 634 (2000)
329 N.J. Super. 553
STATE of New Jersey, Plaintiff-Respondent,
v.
Byron HALSEY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 24, 2000.
Decided April 11, 2000.
Ivelisse Torres, Public Defender, for defendant-appellant (Matthew Astore, Deputy Public Defender II, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (Nancy A. Hulett, Deputy Attorney General, of counsel and on the brief).
Before Judges STERN, KESTIN and STEINBERG.
The opinion of the court was delivered by STERN, P.J.A.D.
We affirm the order denying "defendant's motion to compel the State to release [] evidence" retained by the prosecutor for purposes of post-judgment DNA testing, substantially for the reasons expressed by Judge William L'E. Wertheimer in his oral opinion of October 30, 1998, as supplemented herein.
*635 In this prosecution, tried as a capital case in 1988, the proofs indicated that defendant failed a stipulated polygraph examination and then gave oral and written confessions. Defendant did not testify at trial and asserted an intoxication defense. Defendant was convicted of two counts of felony murder and two counts of aggravated manslaughter by causing the deaths of his girlfriend's young children, and of related offenses including aggravated sexual assault of one of the children.
The trial judge merged the aggravated manslaughter, child abuse (N.J.S.A. 9:6-3) and possession of a weapon for unlawful purpose convictions into the convictions for felony murder, and sentenced defendant to two consecutive sentences of life imprisonment with thirty years before parole eligibility, and to a consecutive sentence of twenty years imprisonment with ten years before parole eligibility for the aggravated sexual assault.
On defendant's direct appeal in 1991 we merged the aggravated sexual assault conviction into one of the felony murders, vacated the merger of the child abuse convictions,[1] affirmed the felony murder and child abuse convictions, ordered the imposition of concurrent sentences for the child abuse, and upheld the sentences for felony murder aggregating two life sentences with sixty years before parole eligibility.
Following unsuccessful petitions for certification and post-conviction relief, defendant filed the present application in May 1997 to compel the State "to turn over any DNA evidence or any rape test kit obtained from the victim to defendant's counsel or his designated expert in the area of DNA testing so that DNA testing may be done on it." Defendant sought "to conduct a DNA test of the semen on the victim[']s panties." Although the prosecutor stated at the hearing that he did not know if the requested evidence "necessarily exists,"[2] he proceeded on the assumption defendant was correct in having asserted in his brief that "the panties ... are [still] in storage in the Union County Prosecutor's Office."[3] The briefs before us do not suggest otherwise.
As defendant does not technically seek post-conviction relief, we do not hold the application for DNA testing was time barred. See R. 3:22-12. Nor do we hold that this case is procedurally barred by the denial of defendant's prior petition for post-conviction relief based on ineffective assistance of counsel for, among other things, not seeking a DNA test. See R. 3:22-4, -5. See also, e.g., Cooper v. United States, 199 F.3d 898, 900-01 (7th Cir.1999) (counsel cannot be found ineffective for the failure to request DNA testing of a hair sample when any test result would prove nothing material to the trial); La Fevers v. Gibson, 182 F.3d 705, 722 (10th Cir.1999) (counsel cannot be found ineffective "for failing to request DNA testing" when such a test "would have been frivolous because even favorable DNA test results would not make a difference in this case"). Compare State v. Velez, 329 N.J.Super. 128, 746 A.2d 1073 (App.Div.2000), where defendant's pro se petition for post-conviction *636 relief asserted both a claim of ineffective assistance of trial and appellate counsel and, independently, that "he was entitled to newly developed DNA testing of the semen samples that had yielded inconclusive results respecting their source." Velez at 132, 746 A.2d 1073.
Because defendant asserts that a scientifically improved DNA test might provide evidence which could not have previously been developed and that the test results could therefore support a motion for new trial based on newly-discovered evidence which "may be made at any time," R. 3:20-2, we hold only that this defendant has not shown enough to compel testing of whatever evidence may remain available at this late date. This is particularly true in light of the overwhelming evidence of defendant's participation in the crime and the nature of the defense. Compare State v. Velez, supra, 329 N.J.Super. at 136, 746 A.2d 1073 remanding after denial of PCR to consider request for new DNA testing where evidence of DNA testing introduced at trial was inconclusive and "the prosecutor heavily relied upon the inconclusive DNA findings in arguing that the jury could not rule [defendant] out as suspect"; State v. Thomas, 245 N.J.Super. 428, 432-34, 586 A.2d 250 (App.Div.1991), appeal dismissed, 130 N.J. 588, 617 A.2d 1214 (1992), in which on defendant's direct appeal we ordered that a DNA test be conducted because a request therefor was made before sentencing in a case premised on identification evidence which "was not strong," and reliable DNA evidence had only recently become available and admissible at trial. See also, e.g., the most recent 1999 cases dealing with post-conviction DNA testing, People v. Savory, 309 Ill.App.3d 408, 242 Ill. Dec. 731, 722 N.E.2d 220, 224 (1999) (defendant is not entitled to obtain DNA testing post-conviction under Illinois statute unless "the scientific testing [has] `the potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence'"); People v. Dunn, 306 Ill.App.3d 75, 239 Ill.Dec. 37, 713 N.E.2d 568, 571-72 (1999) (requiring a defendant to present "a prima facie case for such testing" when post-conviction relief petition "is still pending under review"); Jenner v. Dooley, 590 N.W.2d 463, 472 (S.D.1999) (holding that to be entitled to DNA testing post-conviction, a petitioner must prove that the scientific test is "scientifically reliable" and "admissible" at trial, that "a favorable result using the latest scientific procedures would most likely produce an acquittal in a new trial," and that permitting the testing will not impose "an unreasonable burden on the State").
According to the proofs at defendant's trial, after defendant was told he failed the stipulated polygraph test he started talking "gibberish" and muttered: "work all week, get paid, want to go out, have to babysit for the kids, mother goes to bingo, left alone, no time to go out,"[4] and then said the following while in "a trance-like state":
Talking to Shy, kids making noise, told them to shut off, hung up the phone, told them to shut off, started beating them, Tyrone said he was going to call mommy. Grabbed them both by the throat, stop screaming, started saying, Tyrone, Tina, wake up, they didn't respond. Fuck up, you really fuck up now. Madman. Hid the bodies, bring them downstairs, want speedy trial, needs help, get drunk, act crazy, have to piece things together, losing control, things got bad, committed a violent crime, Margaret please come home, can't come home. What are you all doing? All fucked up. Committed a crime, can't get rid of them, got all fucked up, can't call police. *637 Thereafter, Miranda warnings were administered and defendant gave the following statement following waiver of his rights:
I hung up the phone and I started beating them. They said," I am going to call mommy. Mommy will leave you, anyway she don't like you." They were both saying it. Started beating more. I don't know what happened, telling Tina I messed up. I beat them and grabbed them before they ran out of the house. I grabbed them by the throat one in each hand, I was squeezing them. There was no more life left in them ...
I sexually assaulted a seven year old girl. Where and how I can't remember
...
I can't recall if the basement door was unlocked or I used a key but I remember carrying the two children to the basement at one time.
I walk out the basement, go to the side door and vomit. I say, oh man what did I do this time.
I went back to my room. At this time my mind told me I didn't do nothing. Watching TV like nothing ever happened.
I called Margaret ...
I ask her "where are the children?"
And thereafter, defendant provided the following:
It is dark in one room. Now there is a red brick here. I accidentally hit her (Tina) with it.
I ran out of the room, ran in the other room. I assumed that I didn't have nothing in my hands but I did. I hit Tyrone several times in the head with a brick. He was on the floor when I hit him. I hit Tyrone in the head several times.
In the basement I found some scissors and some nails and I left the nails in his forehead. I used the brick to put some nails in his forehead ...
Defendant's brief on the direct appeal described the physical evidence introduced at the trial from his perspective:
The significance of the device used was that the state ran a laboratory analysis on the brick. A substance found on the head of the nails removed from Tyrone was consistent with the components of the brick.
Similarly, Mr. Ha[ls]ey had provided information regarding the size of the scissors he allegedly used which was inconsistent with the size of the scissors found at the scene. When challenged as to the size of the scissors initially described, Mr. Halsey backed away f[ro]m his initial assertions and reduced the size until they fit those found at the scene. The fact that Mr. Halsey first claimed that the scissors were much larger than those found did not appear in the formal statement.
At the end of Mr. Halsey's statement he was asked how he was treated. He initially claimed to have been beaten by the police and refused food but he retracted that and said he was well treated. Mr. Halsey's initial response was edited from the formal statement.
On cross-examination, Detective Pfieffer conceded that if he were making an attempt to accurately record the questions asked and the answers given, all of that information which was excluded from the formal statement would have been included.
Despite the state's effort to corroborate the defendant's confession with physical evidence, very little was presented at the trial. A Serology expert confirmed that the children had been sexually assaulted and blood samples were found. However the expert could not link Mr. Halsey to the evidence found at the scene nor exclude him as its source.
A trace evidence expert witness testified for the state. However, aside from a hair sample which could have been transferred in the apartment because *638 the children lived with Mr. Halsey, the expert was not particularly helpful in identifying or excluding Mr. Halsey as the perpetrator of the offense.
At trial, the defendant did not testify. Notwithstanding reliance on a general denialargued by trial counsel on summationthe defense did offer testimony of Mr. Halsey's intoxication. The trial judge, finding that the defendant made a sufficient showing of intoxication, charged the jury with the law on voluntary intoxication.
In summary, the state based its case primarily on the defendant's statements and its polygraph expert witness who maintained that the defendant was lying when he said he didn't commit the homicides. The defense contended that the state failed to satisfy their burden of proof that the defendant committed the acts charged but nevertheless presented voluntary intoxication evidence on the issue of defendant's state of mind.
We recognize that scientific evidence and DNA testing have substantially improved over the last decade. For that reason R. 3:20-2 presents a viable means by which a defendant can seek a new trial if he can now show that recently improved scientific methodology, not available at the time of trial, would probably have changed the result. State v. Carter, 85 N.J. 300, 314, 426 A.2d 501 (1981). We also recognize that without the testing defendant may not be able to make such a showing. However, every defendant cannot forever seek to have post-judgment tests conducted in the hopes that something beneficial may result, even assuming that the evidence to be tested remains available.
We affirm the denial of defendant's motion in this case. In defendant's brief on his motion to compel the testing defendant stated:
that a DNA analysis of the victim's clothing will undoubtedly prove that he is innocent. The defendant simply requests that he be permitted to conduct a DNA test of the semen on the victim's panties. When the case was tried the DNA evidence was not available.
He said nothing further at the argument on the motion, and he has not demonstrated why he should be able to conduct DNA testing at this late dateafter the traditional period in which to seek post-conviction relief has expired, see R. 3:22-12as a means of challenging the convictions which survived his direct appeal, felony murder and child abuse.[5]
There has been no showing of what defendant believes the testing will reveal, the basis for such a belief, and why defendant did not present a defense at trial which the testing he now seeks would support. Defendant did not present a defense of alibi nor present evidence of any sort that is consistent with a theory he hopes the DNA testing will now tend to support. Of course, a defendant has no burden at trial. But the trial in this case occurred twelve years ago and, as his brief on the direct appeal reflects, defendant asserted an intoxication defense at trial and argued to us that a diminished capacity charge should also have been given. The fact that the State did not present scientific evidence linking defendant to the killings more than a decade ago cannot by itself give rise to the right to compel release of evidence for non-relevant DNA testing almost ten years later.
Affirmed.
NOTES
[1] The State cross-appealed from the merger of the child abuse convictions into the respective convictions for felony murder.
[2] R. 1:2-3 now provides only that "[a]ll evidence shall be preserved pending direct appeal and proceedings on certification...." We recognize that prosecutors' retention schedules may require preservation of evidence at least through the time for filing and processing of post-conviction relief proceedings.
[3] The 1994 petition for post-conviction relief is not before us, but the State's brief in opposition thereto (included in the State's appendix on this appeal) noted that "[m]uch of the physical evidence in the case was subjected to microscopic chemical enzyme analysis by the F.B.I. laboratory" and that "[i]nitial forensic testing on [defendant's] clothing was performed" but that "[t]here was insufficient bodily fluids on defendant's clothing to conduct any meaningful forensic examination." As will be developed hereinafter, some evidence of scientific testing was introduced at trial.
[4] We have obtained defendant's brief filed on the direct appeal. For present purposes we quote only from defendant's brief and will assume its accuracy. On this appeal neither party developed details about the trial.
[5] Defendant was acquitted of the alleged sexual assault of one of the homicide victims, and the aggravated sexual assault conviction upon the other was merged by us on the direct appeal into the felony murder of the victims as the predicate felony. Defendant does not expressly relate his request for the DNA testing to the surviving convictions, but cf. Velez, supra, 329 N.J.Super. at 136, 746 A.2d 1073, and does not expressly claim that he did not kill either victim.